KELLOGG SWITCHBOARD & SUPPLY CO. v. DEAN ELECTRIC CO. et al.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1910. Rehearing
Denied June 18, 1910.)

No. 1,913.

1. PATENTS (§ 167*)—CONSTRUCTION—UNCLAIMED ADVANTAGES OF INVENTION.
   That a particular advantage of a patented device was not claimed or
   mentioned in the specification will not exclude it from the scope of the
   patent if it was necessarily achieved by the invention.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig.
   § 167.*]

2. PATENTS (§ 17*)—INVENTION.
   That a patentee took but a short step over prior devices in the art,
   which seems simple, does not necessarily negative invention.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 16; Dec. Dig.
   § 17.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—CURRENT CONTROLLING
   DEVICE FOR TELEPHONE CIRCUITS.
   The Dean patent, No. 722,212, for an improvement in telephone circuits
   in a central battery system designed to separate the voice current from
   the energizing current at the subscriber's substation so that the voice
   current only shall pass through the telephone receiver, was not antici-
   pated, and discloses patentable invention, but, in view of the prior art
   and the meager proof as to the utility of the device, is entitled only to a
   narrow construction and a limited range of equivalents. So construed,
   it is not infringed by the device of the Manson patent, No. 818,897, which,
   while accomplishing the same result, is different in structure and princi-
   ple of operation.

Appeal from the Circuit Court of the United States for the Northern
District of Ohio.

In Equity. Suit by the Kellogg Switchboard & Supply Company
against the Dean Electric Company, William W. Dean, Samuel B.
Rawson, Theodore M. Brush, and Arthur E. Barker. Decree for de-
fendants, and complainant appeals. Affirmed.

For opinion below, see 168 Fed. 549.

This suit was brought in the court below for alleged infringement of cer-
tain letters patent. The appellant was complainant below; and the appellees,
the defendants below, comprise the Dean Electric Company and certain of its
officers. The patent in suit was applied for by William W. Dean as inventor,
who subsequently assigned his invention to appellant; and thereafter letters
patent No. 722,212 were issued in favor of William W. Dean, assignor of ap-
pellant, and were delivered to it on the day of their issue, March 10, 1903.
The invention is called "an improvement in subscriber's telephone circuits."
The inventor who assigned his invention to appellant appears to be the vice
president and chief engineer of the appellee company. In addition to the us-
ual averments and denials of pleadings in patent cases, the answer contains
denials of both patentability and infringement of the patent in suit, and also
contains allegations that more than two years prior to the date of Dean's ap-
plication for the patent in suit the same device, or substantial parts thereof,
were patented, described, and shown in various letters patent therein men-
tioned, and, furthermore, that the invention of Dean as claimed under letters
patent No. 722,212 "was abandoned and dedicated to the public by reason of
its description and publication by him or a substantial and material part or
parts thereof" in certain of his prior letters patent therein referred to, or

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the patent in suit "constitutes mere double patenting of the improvements set forth in said letters patent" so referred to.

The alleged infringing device is made according to an invention claimed under letters patent issued to Ray H. Manson, assignor of the appellee company, No. 818,897, dated April 24, 1906, and purporting to be "improvements in telephone systems." The case was tried below upon a vast amount of evidence offered by both sides. The court found that there was no infringement and dismissed the bill, with costs. The case is pending here on appeal.

W. Clyde Jones and R. S. Taylor, for appellant.

C. A. Brown, for appellees.

Before SEVERENS and WARRINGTON, Circuit Judges, and KNAPPEN, District Judge.

WARRINGTON, Circuit Judge (after stating the facts as above). There are two assignments of error. One concerns the finding of noninfringement and the other the dismissal of the bill. In its opinion the court below considered only the question of infringement. It was found that the operation of the invention in suit and the alleged infringing device involved separate and distinct principles of physics, and it was held that there was no infringement for that reason.

Both of the inventions relate to substations in telephone systems of the central energy type; that is, they relate to the places and apparatus occupied and used by the subscribers in systems supplied with current from batteries common to all and located at the central stations. While it is claimed that each patent embraces a number of elements in combination, yet the central feature in each is the placing of the receiver in a path designed for the voice currents and out of the path designed for the energizing current. The voice currents are imposed on the battery current by the vibrations of the diaphragm of the microphone, when speaking into it. The undulations so created are usually described as waves of varying forms and frequency, like a ripple caused by the action of the wind upon the surface of a body of water. The undisturbed portion of the battery current, called the "energizing current," thus both comprises and carries the voice currents. The energizing current is steady; the voice currents are unsteady. Prof. Carhart, one of the witnesses, aptly describes the energizing and voice currents thus:

"When two subscribers are connected for conversation in a central energy system and conversation is in progress, a steady current, used for transmitting signals and for operating the carbon transmitter, flows over the connecting line. Superposed on this steady current are undulations, irregular in form and varying in frequency, which alone transmit the conversation and are called 'voice currents.' Hence the current flowing over the line is a combination of a steady current and an alternating one. It may be roughly illustrated by a continuous band saw, the uniform or unbroken width of which illustrates the steady current, and the teeth the alternating current."

The devices of the patentees, Dean and Manson, were contrived for so separating the voice currents from the steady current at the substations as to avoid certain specified objectionable features of existing telephone systems and at the same time to keep the receiver in the

direct path of the voice currents. To turn again to the simile of the band saw, Prof. Carhart said further:

"Now the problem was to shear off, so to speak, the ragged edge of the band and send it as an alternating·current through the receiving telephone, while the continuous part of the current is carried through another portion of the substation apparatus and thence, together with the alternating part, through the carbon transmitter."

We may now consider what Dean did, and what advance, if any, he made over the existing art. After stating in substance, in the descriptive portion of the letters patent, that it had been the common practice to include the telephone receiver in series with the microphone so that the energizing current would pass through both, and that this was objectionable for various reasons—such as reversal in polarity of the sources of energy through reversal of the line wires by linemen and so demagnetizing the permanent magnet of the receiver, also that in such systems the coils of the receiver must be made of larger wire than necessary for the talking currents, and that the passage of the energizing current through the coils subjected the diaphragm to a constant pull or tension requiring increased rigidity thereof and considerable air space between it and the ends of the magnet poles, and "thereby decreasing the efficiency of the receiver"—Dean said:

"It is the object of the present invention to remove the receiver entirely from the influence of the energizing current traversing the microphone, whereby the several objections above enumerated are obviated.
"In accordance with the present invention the receiver is included in a path which is opaque to the passage of the energizing current, which is usually continuous, while a parallel path is provided around the receiver which is opaque to the passage of the talking currents, while permitting the energizing current to freely pass therethrough. In practice I usually include a condenser in the path containing the receiver and an impedance or choking coil in the path which is parallel thereto."

He then displays his invention by two diagrams: Fig. 1 illustrating a system embodying his invention, and Fig. 2 a modification thereof. It is not necessary to present the latter diagram. Fig. 1 is as follows:

*Fig. 1.*

He then states:

"I have illustrated in Fig. 1 two telephone lines embodying my invention in connection with central-station apparatus of well-known form. When the subscribers are connected for conversation, the central battery, r, is adapted to send current over the limbs, a a', of the telephone line. When the receiver, f', is removed from the switch hook, f2, the same engages contacts 7 and 8. The microphone, f, is shown as connected between the contact, 8, and the limb, a, while the switch hook, f2, is connected with the limb, a'. The receiver, f', is connected with the contact, 7, in circuit with the condenser, 1. An impedance or choking coil, k, is interposed in the parallel path around the

182 F.—63

receiver, f'. The bell, f³, may be connected between the limb, a, and the parallel path containing the receiver, so that the bell will be in circuit with the condenser, 1.

"The condenser, 1, renders the path containing the receiver opaque to the passage of energizing current from the battery, r, and consequently the energizing current does not traverse the coils of the receiver. The energizing current may, however, freely pass through the parallel path containing the impedance coil, k, since said coil interposes but slight resistance to the passage of a continuous current. The impedance coil prevents the passage of the talking currents, which are thus choked back and caused to pass through the condenser, 1, and the receiver, f'. The bell, f³, should be of high resistance—say of one thousand ohms resistance—so that the talking currents and the energizing current will not readily pass therethrough.

"When the receiver is upon the hook, the hook, f², rests out of contact with the contacts, 7 and 8, and the circuit through the receiver and the microphone is thus opened. Calling current sent from the central station will traverse the condenser, 1, and bell, f³. When the subscriber responds and lifts his telephone from the hook, the current from the energizing battery, r, is closed over limb, a, microphone, f, contact, 8, switch hook, f², through coil, k, and limb, a', back to the battery. The condenser, 1, prevents the passage of the energizing current through the receiver, f'. Talking currents repeated through the repeating coil at the central station pass over limb, a, through microphone, f, contact, 8, switch hook, f², contact, 7, thence through the receiver, f', and condenser, 1, to limb, a', and back to the central station. The impedance coil, k, prevents the passage of the talking currents therethrough, thereby causing the same to follow the path through the receiver.

"It will be understood that the arrangement of the microphone, bell, and switch hook contacts may be varied as desired, the essential feature of my invention being the employment of the two parallel paths, one opaque to the passage of the energizing current and containing the receiver, and the other opaque to the passage of the talking currents."

It will be observed that the object of the inventor was "to remove the receiver entirely from the influence of the energizing current"; and that to accomplish this object he employed the two "parallel paths" described in Fig. 1 as the "essential feature" of his invention, making one responsive to the voice currents and the other responsive to the energizing current. Another observation to be made is that the patentee apparently did not limit the invention to the condenser and impedance coil as the instrumentalities to be used for separating the voice currents from the energizing current, for while he showed the condenser and impedance coil in Fig. 1, and included them in most of his claims, he stated before reaching his illustration:

"I usually include a condenser in the path containing the receiver and an impedance or choking coil in the path which is parallel thereto."

Moreover, he used the word "opaque" instead of naming specific devices—and in subsequent definition of that word he spoke of the "condenser or equivalent device" when describing the "two parallel paths as the essential feature of the invention."

There are 13 claims stated in the letters patent in suit. Infringement, however, is charged only as to 4, 11, 12, 13, and 14. All the elements of the combination are displayed on Fig. 1; and, when the 13 claims are taken together, it will be found that they contain all these elements stated in different combinations, and this is true of the claims said to be infringed. Setting out claims 1 and 4 will, we think, answer the purposes of this opinion, for 11, 12, 13, and 14 only add some of the elements omitted from 1 and 4. Claims 1 and 4 are as follows:

"1. The combination with an energizing source of electricity at the central office included in the line to furnish current to the substation for conversational purposes, of a circuit at the substation containing two paths, one containing a steady-current interrupter to make the said path opaque to the passage of steady currents, and the other path being opaque to the passage of voice currents, a transmitter at the substation in the path of said steady currents, a telephone receiver in the path that is opaque to the passage of said steady currents, and a signaling bell connected with the latter path so as to include the said interrupter in its operating circuit, substantially as described."

"4. In a telephone system, the combination with an energizing source of electricity at the central station to furnish current to the substation for talking purposes, of a telephone line adapted to be connected therewith during a connection and having at the substation two parallel paths, a receiver in one of said paths, means for preventing the energizing current from passing through the path containing the receiver to an objectionable degree but permitting the passage of the voice currents, means contained in the other path for preventing the talking currents from passing therethrough to an objectionable degree, while permitting the passage of energizing current, a transmitter at the substation in the main telephone line through which both steady and voice currents pass, and a call-bell at the substation also in a path opaque to steady current but permitting the passage of ringing current, substantially as described."

It is claimed in argument that the Dean structure comprises eight co-operative elements. They, in substance, are the battery, the line conveying the energizing current, the parallel paths, the receiver and condenser in the path of the voice currents, the impedance coil in the alternative path, the microphone adjusted so as to be traversed by both energizing and voice currents, the switch hook, and the signal bell associated with the circuit so as not to interfere with speech transmission. It is admitted that each of these elements is old, but it is urged that the combination is new. We need not consider these elements separately, for, if the invention possesses novelty, we think its basis is to be found in the plan devised for maintaining the receiver in a path responsive to the voice currents and not to the energizing current.

To what extent can it be said that the plan of the inventor was novel? Much testimony was introduced to show the state of the art as it existed at the date of the patent in suit. It was shown that a variety of elements for substation telephones had been employed in the prior art. To the original telephone instrument used alternately as a transmitter and receiver, having only a single telephone wire between two stations and the return grounded, new elements were added from time to time until their co-operating qualities became important.

This development is illustrated by a series of diagrams which were presented and explained by Mr. McMeen, one of the witnesses for appellees, and apparently accepted by appellant as correctly illustrating the progress of the art. The first one (Fig. 1) shows a single-wire telephone line equipped with a combined receiver and transmitter at each end. Fig. 2 shows the addition of a transmitter with an induction coil attached, which rendered further use of the receiver as a transmitter unnecessary. This transmitter was energized from a direct battery. Fig. 3 is the same as Fig. 2, except that the line between stations comprises two wires. Signal and switch devices were connected with each of the substation systems so described.

Later, the central battery system in place of the local battery was introduced, with a number of beneficial results, including a change in the plan of signaling between the central station and subscriber. Fig. 4 of the diagrams before mentioned shows the central battery, the lines leading thence to the substation, the signal-bell line with a condenser thereon and extending between the two limbs of the direct line; but the induction coils of Figs. 2 and 3 are omitted. Figs. 5 and 6 show further changes, including connection between the direct line and receiver circuit through induction coils. Fig. 7 is as follows:

We think the evidence clearly shows that this plan of substation was in rather extensive public use for several years prior to the date of the patent in suit. Any comparison of this figure with Fig. 1 of the patent in suit, before set out and described, will show a number of features of identity. For instance, the two parallel paths found in the patent in suit are present in this plan; the receiver, f', being maintained in one and the impedance coil, k, in the other. The condenser, 1, however, is not placed in the path of the receiver. It is maintained in the line of the signal bell, f³. True, the signal-bell line and the receiver line are connected; but plainly the condenser could not in that position affect either the energizing current or voice currents, the same as it would if placed in the path of the receiver. The inventor of the alleged infringing device testified in reference to devices constructed according to the plan of Fig. 7, which he saw in operation in Youngstown, Ohio, that about 30 per cent. of the energizing current passed in each instance through the receiver during its use in conversation.

The question, then, of the validity of the patent in suit, is reducible to this: Whether Dean's change in the location of the condenser from the signal-bell line to the path of the receiver constituted patentable invention. Indeed, this is admitted by the senior counsel for appellant. But he insists that this "short step" was invention. If we consider the subject merely retrospectively, the change seems very simple. But this is not a true test. In Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 Sup. Ct. 652, 655 (53 L. Ed. 1034), Mr. Justice Day, in affirming a decision rendered by this court (Judge Severens announcing the opinion here), had occasion to say of the patent there involved:

"It is suggested that Golding's improvement, while a step forward, is nevertheless only such as a mechanic skilled in the art, with the previous inven-

tions before him, would readily take; and that the invention is devoid of patentable novelty. It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that, if those skilled in the mechanical arts are working in a given field and have failed after repeated efforts to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. There is nothing in the prior art that suggests the combined operation of the Golding patent in suit. It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent. Loom Company v. Higgins, 105 U. S. 580–591 [26 L. Ed. 1177]."

It must be borne in mind that Dean's conception involved more than the mere change in location of the condenser. The very object of his invention, as stated in the letters patent, was "to remove the receiver entirely from the influence of the energizing current." This, too, as will be seen later, was in effect the purpose of the Manson device. Dean attempted to carry out this object by placing the condenser in one of two parallel paths, the path of the receiver, and so making that path "opaque to the passage of the energizing current," and the other "opaque to the passage of the talking currents." Both of these things were precisely what was not done in the plan described in McMeen's Fig. 7. The most that can be said of that plan is that only one of these things was done; and that was by introducing the impedance coil, k, in the path alternative to the path of the receiver. But this was not enough. It was necessary also to make the path of the receiver opaque to the energizing current; this Dean did.

It is true that Dean's plan, as indeed Manson's, does not wholly exclude the energizing current from the path of the receiver. But in view of the evidence on the subject, including what Manson says happened at Youngstown under the old plan described in McMeen's Fig. 7, we do not think the degree of leakage reached in the Dean device is objectionable. It is shown by the evidence that almost constant effort was made to improve the substations by excluding the energizing current from the receiver. In the earlier progress of the art, this seemed to be accomplished in one or two instances; but these proved to be objectionable in other respects. For example, the induction coil was resorted to for the purpose of transferring the voice currents to the path of the receiver. Furthermore, almost the equivalent of a short circuit was encountered between the transmitter and the path of the voice currents. These resulted in conveying annoying side tones into the receiver.

It is clearly to be inferred, from McMeen's testimony in regard to the devices illustrated by his diagrams, that the improvement made by Dean would avoid side tones; and this does not seem to be controverted. There is direct evidence to the effect that the Dean plan ought to work successfully; and, further, that it was in actual use in St. Pau' and other places not named, except that a change had been made in

the location of the signal-bell line. This change seems to have been warranted by that portion of the letters patent, which states:

"It will be understood that the arrangement of microphone, bell, and switch hook contacts may be varied as desired."

But the evidence does not definitely show what results in point of utility have been secured through use of the device.

· It is objected that the advantage of avoiding side tones is not mentioned in the specifications. This is true. But this omission was not fatal if the advantage was necessarily achieved through the invention. Goshen Sweeper Co. v. Bissell Carpet Sweeper Co., 72 Fed. 67, 73–75, 19 C. C. A. 13, 19–21; Dowagiac Mfg. Co. v. Superior Drill Co., 115 Fed. 886, 895, 53 C. C. A. 36, 45; Stilwell-Bierce & Smith-Vaile Co. v. Eufaula Cotton Oil Co., 117 Fed. 410, 415, 54 C. C. A. 584, 589; Morgan Engineering Co. v. Alliance Machine Co., 176 Fed. 100, 107, 100 C. C. A. 30.

Some patented devices have been placed in evidence, and one or two of them have been urged upon our attention as fairly anticipating the patent in suit. But we do not think it necessary to consider these, because we are convinced that the plan displayed in Fig. 7 aforesaid more nearly anticipated the Dean patent than that described in any of those letters patent. Mr. McMeen in effect admitted that the plan displayed by his Fig. 7 did not exclude all of the energizing current, and claimed only that it made "a fair approach" to such a result. He said:

"While the best conditions require that no steady current shall flow through the receiver, this circuit gives a fair approach to such a result, and in practice the harmful results of steady currents through the receiver are very much reduced by means of this circuit."

According to the evidence, Dean was the first in the telephonic art to get the voice currents into the receiver by direct and continuous path, and at the same time practically to exclude the energizing current. He did this by placing an old device in a new location, and so, through combination with other elements old in themselves, secured a new result. We are therefore of opinion that Dean made an improvement of such merit as to entitle it to the rank of patentable invention. See cases cited in Morgan Engineering Co. v. Alliance Machine Co., supra (page 109 of 176 Fed., page 39 of 100 C. C. A.), on the subject of patentability. It is true there was left to him but a "short step," as before stated; but, as urged by counsel, if this step was within the skill of the art, why was it not taken in the long struggle that we have but outlined? Considering the prior art, however, we cannot believe that the patent is entitled to a broad construction; on the contrary, in view of the earlier uses made of the condenser, we think the patent can be accorded only a narrow construction.

· In National Malleable Casting Co. v. Buckeye M. I. & C. Co., 171 Fed. 847, 855, 96 C. C. A. 515, 523, this court was required to determine the range of equivalents that should be accorded to the assignee of a patented automatic car coupler. The present Mr. Justice Lurton, announcing the opinion of the court, said:

"The art to which the patent in question belongs is so crowded with devices intended to accomplish the same purpose as to leave little room for the in-

ventor. That there has been a slow, step by step, advance in the direction of the ultimate automatic coupler, and a final result, is as much as can be said. That the combination of Dietz involves some advance, we fully concede; but that he made such an improvement as to entitle him to any considerable range of equivalents we cannot concede."

Another feature of the decision in that case (page 853 of 171 Fed. [96 C. C. A. 515]) is so far traceable in the present case as to admonish us that it would not be safe to accord to this patent anything but a limited construction; it is the fact that the proof as to its utility is meager.

It remains to dispose of the question of infringement. We here reach the point perhaps of greatest dispute. It is how the energizing current is controlled by the device covered by the patent in suit. The effect of the contentions on both sides touching the principle of exclusion of the energizing current from the path of the receiver in their respective devices brings them into harmony concerning the principle of exclusion involved in appellees' device; and there is no difference between them as to the operation of the voice currents in either device. The insistence of the appellant is that through its device the energizing current is excluded from the path of the voice currents and the receiver, by a balance of opposed electromotive forces; and this is the principle which is claimed by both sides respecting the operation of appellees' device. But it is urged by appellees that the exclusion wrought by appellant's device is due alone to resistance of the condenser in that path.

In settling a difference of this character, it is obvious that we shall have to rely upon what we conceive to be the weight of the evidence relating to it. As said by Lord Mansfield:

"It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted." Cowp. 65.

Mr. Smythe, a witness for appellant, gave an extended description of the condenser with diagrammatic illustrations. The following are two of his diagrams:

*Fig. 2*                    *Fig. 3*

· He explains that Fig. 2 illustrates two metallic plates, B and C, slightly separated; that when key, E, is closed, a charge of electricity flows from the positive pole of battery, D, to the plate, C

"—where it accumulates and by inductive action attracts, or, as it is said, binds an equal charge of negative electricity on the other plate, B, an equal positive charge which has hitherto combined with the attracted negative charge being released, and flowing to ground. As soon as a charge equal to what the condenser, or pair of plates, B C, will hold, has flowed into the plate, C, the current flow ceases. * * * It will be seen that, within limits determined by the capacity of the condenser for holding or storing electricity, the action in the circuit is the same as though the condenser were not there. In the case illustrated in Fig. 2 four units of positive electricity flow through the part of the circuit between the key, E, and the condenser, and an equivalent four units of positive electricity flow at the same instant in the part of the circuit beyond the condenser. But with respect to a steady and continuous flow of current the condenser interposes a barrier to all such flow in excess of the amount which it is adapted to hold."

Fig. 3 was used to illustrate the arrangement for increasing the capacity or storing power of the condenser by the use of metallic plates

"—interleaved with each other and electrically connected in two series, B C, of alternating metallic leaves or plates separated by sheets of insulating material, A. As one of the factors upon which the capacity of the condenser depends is the area of the surfaces of the plates exposed to each other, it will be seen that by multiplying the plates, as indicated in Fig. 3, the capacity for storing electricity of the condenser may be greatly increased. In constructing condensers for use in telephony and like arts substantially this method is employed for obtaining large electrical capacity in small space."

It is true, as claimed by one of counsel for appellant, that Mr. Smythe said of the condenser that it automatically opposed the "pressure of the current in the main circuit with a force just equal to it," yet he used this by way of analogy to the action of an electrolytic cell, when he was asked to state whether there were other known devices that could be used in an electric current to produce results similar to those of the condenser. He further said of the condenser, however:

"It is upon the noninductive or insulation resistance of a condenser that its power of opposing direct or steady current flow depends, and to such current flow it is nothing more nor less than a noninductive resistance. It may also be said that the insulation resistance or noninductive resistance of a condenser is often such that, while it is sufficiently high to constitute a practically impassable barrier to steady current flow, it is still sufficiently low to permit alternating or undulating currents to pass that may readily be detected by a sensitive device such as a telephone receiver."

As we understand Mr. Smythe, the passage of the voice currents through the condenser is caused by induction, while the passage of the steady current is prevented by the noninductive or insulation resistance of that device. This we think explains his meaning when he states, as before pointed out, that "the condenser interposes a barrier" to all flow of steady current "in excess of the amount which it (the condenser) is adapted to hold"; and also when he calls this barrier "practiclly impassable."

As it seems to us, one of the three experts called by appellant failed to reach a definite conclusion on this subject, especially in view of what

he said in cross-examination. But Prof. Carhart stated in his direct testimony:

"Now, a very important fact connected with this charging of the condenser is that the condenser when charged exerts a back electric pressure. When this back pressure equals the electric pressure applied from the two terminals of the impedance coil, the charge ceases to run into the condenser, and the back electric pressure, due to these charges in the condenser, equals the pressure applied in the other direction from the terminals of the impedance coil, k. So far as steady currents are concerned, therefore, the condenser serves to put the receiving telephone in a balanced relation between two opposed electric pressures.

"When, however, voice currents come over a line the electric pressure applied at the two points where the branch joins the impedance coil immediately begins to vary, thus disturbing the electric balance of the receiver and condenser, and alternating currents flow through the receiver into and out of the condenser in the automatic attempt of the condenser to maintain an electrical equilibrium or balance. The effect on the receiver is the same as if the voice currents traversed the receiver branch without the interposition of the condenser; but, as a matter of fact, the alternating currents through the receiver consist of the varying charges running into and out of the condenser."

On his cross-examination this occurred:

"XQ. 37. As I understand you, in the device of the patent in suit as shown and described therein, particularly as illustrated in the drawing, the steady currents are excluded from the receiver by the resistance interposed by means of the condenser. Is that correct?

"A. In the particular embodiment of the invention shown in Fig. 1 of the patent, and disregarding the direct current through the ringing bell, direct current is excluded from the receiver by the resistance of the condenser, except during the very short interval of time during which the condenser is charging. The flow during that time is properly direct, though not steady current. I have shown, however, in my direct testimony, that the resistance of the condenser is only one of the possible means of excluding steady current from the receiver."

The clear tendency of appellant's proof is to show that the condenser operates upon the steady current by resistance. The "very short interval of time during which the condenser is charging," as Prof. Carhart said, when, as he had before stated, "this back pressure equals the electric pressure applied from the two terminals of the impedance coils," does not appear to us to describe the principle involved in the exclusion of steady current throughout the varying periods of time consumed in the ordinary and well-known uses that are made of substations. Any other theory than momentary "back pressure" would apparently overtax the "capacity or storing power" of the plates comprised in the condensers described by the evidence; and we do not discover evidence tending, or at least sufficient, to show any continuing process of recharging the condenser and re-exertion of back pressure during the time the substation is in actual use. There must be added to this the conclusion reached by Mr. Smythe as before pointed out. Moreover, the very structure of a condenser, its insulation material operating as in effect it must to open the line to steady current, negatives the idea of counter electromotive forces. When trying to ascertain the fact touching the operation of the condenser, as distinguished from the patentee's right to the benefit of such operation as in truth takes place, it is worthy of mention that in his letters patent Dean makes no suggestion of counter electromotive pressures, but only of

the quality of the condenser to "prevent" the flow of energizing current. We are strengthened in the views we have expressed by the evidence offered by appellees.

The following diagram displays all that is needed respecting Manson's patent, and it was used generally by the witnesses as well as by counsel for appellant:

The portion of this device which is said to infringe the patent in suit is a type of Wheatstone's bridge, a very old apparatus and also well-known in the telephonic art. In each of the two arms of this diagram, extending from 1 to 2 and from 3 to 4, is an impedance coil, A and D; in each of the two arms, extending from 2 to 4 and from 1 to 3, is a noninductive resistance coil, B and C. According to our understanding of the admitted principle of Wheatstone's bridge, it would be conceded that, if the resistances of these coils are rightly proportioned and maintained, the ordinary bridge equation would be satisfied; and that, by reason of the equal potential at points 2 and 3, no current passing through the arms of the bridge between 4 and 1 would flow in the bridge wire extending from 2 to 3 or through the path of the receiver or the receiver itself, f'.

Manson, the inventor of the device in this form and a witness for the appellees, testified in reference to the above diagram:

"In my patent, the balanced Wheatstone bridge is used to keep the flow of direct current from the telephone receiver. This bridge, being made up with the usual four arms, the two diagonal arms being retardation windings, and the other two arms noninductive windings. * * * The retardation windings are represented by A and D, and the noninductive windings by C and B. The resistances of these four arms are taken such that there will be no difference of potential for direct current flow between the points 2 and 3 of the bridge; therefore there will be no tendency for direct current used in operating the transmitter, f, to flow through the telephone receiver.

"In the circuit of the patent in suit, two paths are provided across the line, one of which contains an impedance coil, k (Fig. 1 of patent specification), which is practically transparent to the flow of direct currents, but which is opaque to the flow of high frequency alternating currents, such as produced by the voice; the second path, which contains the receiver, f', also contains a condenser, 1, which is opaque to the flow of direct currents, but which is practically transparent to the flow of alternating currents. In this arrangement, the direct currents are prevented from flowing through the receiver by interposing a device, which actually stops the flow, while in my patent referred to above the receiver is located in such a position that there is no tendency for these direct currents to flow."

These views of Manson are supported by opinions expressed by both McMeen and Miller, experts for appellees; the former saying:

"No attempt is made in defendants' device to oppose the flow of steady current through the receiver, and in that particular the circuit of the patent in suit and of defendants are diametrically opposed. In the one, current is prevented from passing through the receiver path by introducing a piece of ap

paratus in that path; this being a condenser, chosen solely because of its ability to open the path for steady current. In the other, defendants' circuit, a flow of steady current is prevented simply by arranging in advance that the receiver shall be connected to points between which no steady current ever has a tendency to flow, no matter how much steady current is flowing in the main circuit or through the transmitter."

We do not overlook the evidence offered by appellant to show that impedance coils are placed by appellees in two of the arms in Wheatstone's bridge; but if McMeen's Fig. 7, before commented on in describing the prior art, is recalled, it will be seen that the impedance coil in the alternative path of the Dean patent was old. What Dean contributed to the art, as before shown, was placing the condenser in the path of the receiver, as part of his combination of elements. Nor do we overlook the fact that Wheatstone's bridge was not Manson's invention. But in this respect Dean bore the same relation to the condenser as that borne by Manson to the bridge.

The marked differences between the two devices, both in structure and law of operation, are what impress us on the question of infringement. The differences between them structurally are manifest. The difference between the laws of operation governing them is that in principle they are exact opposites. Where the Dean device excludes, the Manson device avoids; exclusion of the energizing current from the path of the receiver in the former is accomplished by physical obstruction, while in the latter it is accomplished by a balance of potential at· the terminals of the path of the receiver. It is true that the same result is gained in both instances. This objection, however, is met not alone by difference in form, but also by opposed principles of operation. It follows, from what we have said of the limited construction which must be placed upon the patent in suit, that there is no range of equivalents within which the present complaint of infringement falls. The word "means" appearing in No. 4 of the claims alleged to be infringed must be construed as referring to the condenser mentioned in the specifications.

The decree below will be affirmed, with costs.