## METROPOLITAN DEVICE CORPORATION v. CLEVELAND ELECTRIC ILLUMINATING CO.

Circuit Court of Appeals, Sixth Circuit. December 6, 1929.

No. 5132.

D. Anthony Usina, of New York City (Richey & Watts, of Cleveland, Ohio, and Benjamin T. Rauber, of New York City, on the brief), for appellant.

John B. Hull, of Cleveland, Ohio (Chas. E. Brock and Hull, Brock & West, all of Cleveland, Ohio, on the brief), for appellee.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

HICKS, Circuit Judge. ▮ Suit for infringement of claims Nos. 3 and 4[1] of Tor-

---

[1] "3. An electric cable, comprising a sheath, a line conductor having a joint, a body of pervious insulating material inclosing said joint, the said sheath being removed for a distance sufficient to expose said pervious body, a sleeve of impervious material of greater diameter than said

chio Patent No. 1,172,322, granted February 22, 1916, for a protective device for electric cable joints. The defenses were: (1) Lack of invention; (2) anticipation; and (3) noninfringement. The bill was dismissed for lack of invention. The court disregarded a disclaimer[2] filed four days before the trial. We think it should have been permitted. That portion of the disclaimer disapproved is as follows: "* * * And except as to insulating liquid which is fluid at ordinary working temperatures of such cables and in quantity sufficient to supply at all times the demands by the cable in use, and by the joint."

The criticism of the District Judge was that the limitation sought affected the quality and quantity of the insulating liquid, and from his viewpoint the specifications said nothing concerning either. We cannot yield thereto. We think the disclaimer may without violence readily stand upon the following descriptive matter in the specification, to wit: "I fill the sleeve and the reservoir with any suitable insulating oil or other liquid which is fluid at low temperature and preferably of a character which will combine with the material used in the body of the cable for permeating or imbedding the insulating wrappings. This liquid I preferably force into the sleeve 8 under pressure sufficient to drive

it in the interstices of the cable ends and into the joint wrappings and fillings. When the introduction of the liquid is complete I permit it to fill the reservoir 10 which is finally closed. The oil in the reservoir then serves to supply any deficiency in the sleeve caused by absorption and breathing of the cable or the disturbance of the conductors carrying sudden overload currents, so that the joint insulation is not only thoroughly permeated at the outset but continues submerged in a bath of insulating oil." Again: "It is to be observed that the insulating fluid not only permeates the wrappings and fillings at the joint but also percolates into the insulation of the cable ends exposed in order to make the joint. This is of practical importance, because it often happens that during the making of the joint, the exposure of said ends permits of the permeating liquid used in the original manufacture of the cable to 'bleed' or run out and a consequent failure of insulation at these points ensues. This I have found to be the cause of breakdowns which were apparently unaccountable. The new fluid put into the joint sleeve supplies this loss and effectually prevents difficulty."

The specifications fairly set forth the quality of the insulating compound. It is: "Fluid at low temperature." Any liquid, fluid at low temperature, is necessarily "fluid at ordinary working temperatures," and the disclaimer therefore sets up no new claim as to quality. The same is true as to the quantity of the liquid and the purpose of its use, to wit: "Quantity sufficient to supply at all times the demands made by the cable in use and by the joint." The specifications fairly call for a quantity sufficient to fill the sleeve and the supplying reservoir so that the joint insulation shall not only be continuously submerged in the oil, but that the amount drawn from the sleeve by the absorption and breathing of the cable shall be correspondingly restored to the sleeve from the reservoir.

The record carries no suggestion of any intent to broaden the claims beyond the specification (tit. 35, § 65, U. S. C. [35 USCA § 65]), or any idea of obtaining the benefit of a reissue. We think the effect of the disclaimer is to clear up an awkwardly worded, and therefore a somewhat ambiguous, description in the specification. See Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 22 S. Ct. 698, 46 L. Ed. 968; Simplex Ry. Appliance Co. v. Pressed Steel Car Co. (C. C. A.) 189 F. 70, 72. We also think that the disclaimer was not unreasonably delayed. As stated in Sessions v. Romadka, 145 U. S. 29, 12 S. Ct. 799, 801, 36 L. Ed. 609: "The

---

body, inclosing the same and hermetically united at its ends to said cable sheath, and an insulating fluid adapted to permeate said pervious body contained in the space between said body and said sleeve."

"4. An electric cable, comprising a sheath, a line conductor having a joint, a body of pervious insulating material inclosing said joint, the said sheath being removed for a distance sufficient to expose said pervious body, a sleeve of impervious material of greater diameter than said body, inclosing the same and hermetically united at its ends to said cable sheath, a receptacle communicating with the interior of said sleeve, and an insulating fluid adapted to permeate said pervious body contained in said receptacle and the space between said body and said sleeve."

[2] "No. 1,172,322.—Philip Torchio, New York, N. Y. Protective Device for Electric-Cable Joints. Patent dated February 22, 1916. Disclaimer filed February 11, 1927, by the assignee, Thomas E. Murray.

"Hereby makes disclaimer of the improvement described except for electric cables, which comprise a line conductor, insulating wrappings permeated with insulating compound and a sheath of flexible inelastic metal constituting a unitary product of manufacture and commerce which is portable and capable of being drawn through conduits; and except as to an insulating liquid which is fluid at ordinary working temperatures of such cables and in quantity sufficient to supply at all times the demands made by the cable in use, and by the joint."

power to disclaim is a beneficial one, and ought not to be denied except where it is resorted to for a fraudulent and deceptive purpose." In Excelsior Furnace Co. v. Williamson Heater Co., 269 F. 614, 619 (C. C. A. 6), the disclaimer was allowed after decision on appeal. See, also, N. O. Nelson Mfg. Co. v. F. E. Meyers & Bro. Co., 29 F.(2d) 968, 969 (C. C. A. 6). The view we take is that the matter of disclaimer was within the discretion of the patentee to be reasonably exercised—"a matter of policy"—[Permutit Co. v. Wadham, 13 F.(2d) 454, 457 (C. C. A. 6)], and we think there was sufficient doubt as to whether claims 3 and 4, as originally written, were anticipated to justify the seeming delay. Walker on Patents (2d Ed.) § 255.

As to invention: The necessity therefor was great. In high voltage cables, i. e., cables carrying in excess of 15,000 volts, the dielectric loss from faulty insulation, with the resultant destruction of the wrappings of the cable and the breaking down of the joints, was serious. Torchio discovered that this loss was due in part to the "bleeding" of the insulating compound from the exposed cable ends during installation. He also discovered that the cable "breathed" or "sucked," that is, that while in use the heat expanded it and that it correspondingly contracted while cooling; that this bleeding and expansion of the cable forced the insulating compound from the interstices of the pervious insulating wrappings and fillings, permitting dielectric loss and structural damage. The problem was to restore this lost insulation. The teaching had been that the insulating compound in the joint should not be soft enough to flow. The thought was that the compound should not be permitted to escape and leave the joint unprotected. Torchio substituted a liquid insulating compound for the compound with a low melting point theretofore in use in the cable sleeve. Torchio's liquid compound would and did, especially under pressure, flow along the cable length between the conductors and the leaden sheath and refill the empty cells of the pervious insulation. This was new and useful and was a commercial success. It was not a mere refinement of the former method; it was a reversal of it. We think it was somewhat beyond the skill of an expert and amounted to patentable invention. Gear Grinding Mach. Co. v. Studebaker Corp., 270 F. 934, 935 (C. C. A. 6).

Nor was plaintiff's invention anticipated by the prior art. The cable, the insulating compound, the sleeve with its soldered joint, and possibly the cable joint construction, were all old, but they were not old in combination. In the new combination they produced a new result and therefore were not anticipated. Webster Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Detroit Carrier & Mfg. Co. v. Dodge Bros., 33 F. (2d) 743, 747 (C. C. A. 6); Michigan Carton Co. v. Sutherland Co., 29 F.(2d) 179, 183 (C. C. A. 6); Ferro Concrete Constr. Co. v. Concrete Steel Co., 206 F. 666, 669 (C. C. A. 6); Kellogg Switchboard & Supply Co. v. Dean Elec. Co., 182 F. 991, 998 (C. C. A. 6).

We have examined the prior art references, but review here only those discussed in defendant's brief:

First. The Brooks-Hunt group—United States patents to Brooks, No. 165,535 and No. 210,986, respectively, and the British patent to Hunt, No. 4828, communicated from Brooks. These at least approach a nonanalogous art. They do not deal with the modern high voltage cable. They are concerned only with low voltage telegraph wires separately insulated and drawn through iron pipes. They were abandoned as useless long before the advent of the unitary cable with the leaden sheath.

Second. British patent No. 11,932 to Abel. This does not involve such a cable as does Torchio. It deals with a cable composed of a central conductor and concentric conductors insulated from each other and with the manner of joining the conductors at the cable ends and when so joined then with joining similar cable ends. The insulating fluid in the sleeve does not contact with the joints. They are protected by impervious caoutchouc.

Third. British patent to Ferranti, No. 16,237. This discloses a conductor composed of concentric metal tubes. It in no sense deals with joint construction.

Fourth. British patent to Watson, No. 29,756. The District Judge had substantial basis for doubting whether Watson was prior to Torchio. But, independent thereof, it is clear that the Watson patent does not anticipate even if earlier. It discloses a cable in which the conductors are helically wound in paper wrapped twine, thus forming continuous ducts or channels for the insulating liquid throughout the cable length. It does not disclose joint construction or joint insulation or teach the method of uniting the joint box or sleeve with the cable.

Infringement. The question of infringement is not difficult. The striking similarity of the devices as illustrated by the drawings and description of defendant's joint as defined in plaintiff's exhibit 7 is conclusive upon the matter of construction. The defense that the viscosity of the insulating compound

used in defendant's joint prevents it from oozing or flowing into and through the cable is not persuasive, in view of defendant's admission that this compound, normally of the consistency of vaseline or jelly, did, under stress, escape from the reservoirs to the extent of collapsing them, and that for a time it was necessary to periodically refill the joints. Defendant advances no explanation of what had become of the lost compound. There is none, except that the working temperature of the cable heated it and the combined action of the pressure from the reservoir and the "breathing" or "sucking" of the cable during contraction drew it into the cable length. The word "fluid" is not necessarily to be defined with the extreme meaning permitted by the dictionary. Such words are to be given a reasonable interpretation in view of the association. Clipper Belt Lacer Co. v. E-W Co., 237 F. 602, 605 (C. C. A. 6); Farrington v. Haywood (C. C. A.) 35 F.(2d) 628, decided November 13, 1929.

Finally, upon the above views, we conclude that the Torchio patent, No. 1,172,322, was valid and infringed, and the decree is therefore reversed, with directions to enter a new decree in accordance with this opinion.