**ELECTRIC CABLE JOINT CO. v. BROOKLYN EDISON CO., Inc.**

**No. 393.**

Circuit Court of Appeals, Second Circuit.

Sept. 21, 1933.

■

MANTON, Circuit Judge, dissenting.

---

■

Usina & Rauber, of Washington, D. C. (Anthony Usina and Melville Church, both of Washington, D. C., of counsel), for plaintiff-appellant.

Monroe & Byrne, of New York City (Charles Neave and John D. Monroe, both of New York City, of counsel), for defendant-appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is the ordinary suit for patent infringement. The patent is No. 1,172,322 to Philip Torchio, and the only claim in issue is claim 4, which reads as follows: "An electric cable, comprising a sheath, a line conductor having a joint, a body of pervious insulating material inclosing said joint, the said sheath being removed for a distance sufficient to expose said pervious body, a sleeve of impervious material of greater diameter than said body, inclosing the same and hermetically united at its ends to said cable sheath, a receptacle communicating with the interior of said sleeve, and an insulating fluid adapted to permeate said pervious body contained in said receptacle and the space between said body and said sleeve."

According to the specification, the invention is a device for preventing current leakage at a joint in an electric line conductor. It consists in a construction "whereby the joint is immersed in a fluid insulating medium adapted to permeate the pervious wrapping of the joint, whereby said fluid after permeation of said wrapping is retained therein by a denser body of insulating material surrounding said wrapping, and whereby the joint is inclosed in two metallic sleeves united at their ends to one another, separated between said ends and electrically connected at said ends to the cable sheath, whereby the potential on the said sleeves becomes that of the sheath and breaking down of insulation between said sleeve or ionization of air between them is prevented."

The patentee, after stating that a fluid insulating compound adapted to permeate the interstices in the insulating wrappings and filling of the joint is poured through two

holes in the sleeve, goes on to say that he found that the fluid compound did not operate efficiently. To explain this lack of efficient operation, he says that, in case of some of the fluid compounds, voids or openings were formed, due to the contraction of the material on cooling and hardening. In others, because of their quick cooling and hardening, due to contact with the cold insulation, the fluid fails to permeate the wrappings and filling. He says that in almost all of them the insulating liquid if rendered fluid by heat causes a deterioration of the insulation at the point where the fluid first meets the insulation; that in all of them, the insulating compound on hardening will crack under mechanical stresses, especially when the conductors carry heavy overload currents. He remarks that: "The consequence is that, by reason of these cracks and voids and the ionization of air in them, a lowering of dielectric strength of the joint insulation takes place, so that electric lines transmitting high tension currents, especially if underground, have their weakest places at the joints and at the ends of the sheathing * * * where connected to the joint covering sleeve * * *."

The patentee says that he has succeeded in overcoming the foregoing difficulty by filling "the sleeve and reservoir with any suitable insulating oil or other liquid which is fluid at low temperature and preferably of a character which will combine with the material used in the body of the cable for permeating or embedding the insulating wrappings." He says that he preferably forces liquid into the sleeve under pressure sufficient to drive it into the interstices of the cable ends and into the joint wrappings and fillings; and that when the introduction of the liquid is complete he permits it to fill the reservoir which is finally closed. He adds that: "The oil in the reservoir then serves to supply any deficiency in the sleeve caused by absorption and breathing of the cable or the disturbance of the conductors carrying sudden overload currents, so that the joint insulation is not only thoroughly permeated at the outset, but continues submerged in a bath of insulating oil." He says that instead of making the reservoir in the form of a separate chamber communicating with the sleeve, one may dispose the sleeve eccentrically on the joint, so that the greatest clearance will be uppermost, and that in this way one may produce an additional holding space for the oil within the sleeve itself. He also remarks that where for any reason it is not desirable to keep the sleeve filled with a light fluid, such as oil, one may first cause the wrappings and filling of the joint to be permeated with a light fluid and then afterward draw off the surplus liquid and substitute therefor an insulating compound of greater density to fill the space between the joint and the sleeve. The dense compound then acts both as an insulator and as a means of imprisoning the lighter fluid already in the interstices of the filling and wrappings of the joint. He says finally that: "The insulating fluid not only permeates the wrappings and fillings at the joint, but also percolates into the insulation of the cable ends exposed in order to make the joint. This is of practical importance, because it often happens that during the making of the joint, the exposure of said ends permits of the permeating liquid used in the original manufacture of the cable to 'bleed' or run out, and a consequent failure of insulation at these points ensues. This I have found to be the cause of breakdowns which were apparently unaccountable. The new fluid put into the joint sleeve supplies this loss and effectually prevents the difficulty."

The protective device for electric cable joints was limited in a disclaimer filed by Thomas E. Murray, the assignee of Philip Torchio, whereby Murray made "disclaimer of the improvement described except for electric cables which comprise a line conductor, insulating wrapping permeated with insulating compound and a sheath of flexible inelastic metal constituting a unitary product of manufacture and commerce which is portable and capable of being drawn through conduits; and except as to an insulating liquid which is fluid at ordinary working temperatures of such cables and in quantity sufficient to supply at all times the demands made by the cable in use, and by the joint."

Claims 3 and 4 of the patent in suit were before the Circuit Court of Appeals of the Sixth Circuit in Metropolitan Device Corp. v. Cleveland E. Illuminating Co., 36 F. (2d) 477, 479. That court upon the record before it, which was a very different one from that before this court, sustained the patent and held it infringed. Judge Hicks who wrote the opinion stated the basis for the decision as follows: "In * * * cables carrying in excess of 15,000 volts, the dielectric loss from faulty insulation, with the resultant destruction of the wrappings of the cable and the breaking down of the joints, was serious. Torchio discovered that this loss was due in part to the 'bleeding' of the insulating compound from the exposed cable ends during installation. He also discovered that the cable 'breathed' or 'sucked,' that is, that while in use the heat expanded it and that it corre-

spondingly contracted while cooling; that this bleeding and expansion of the cable forced the insulating compound from the interstices of the pervious insulating wrappings and fillings, permitting dielectric loss and structural damage. The problem was to restore this lost insulation. The teaching had been that the insulating compound in the joint should not be soft enough to flow. The thought was that the compound should not be permitted to escape and leave the joint unprotected. Torchio substituted a liquid insulating compound for the compound with a low melting point theretofore in use in the cable sleeve. Torchio's liquid compound would and did, especially under pressure, flow along the cable length between the conductors and the leaden sheath and refill the empty cells of the pervious insulation. This was new and useful and was a commercial success. It was not a mere refinement of the former method; it was a reversal of it. We think it was somewhat beyond the skill of an expert and amounted to patentable invention."

The only difference between claim 3 and claim 4 of the patent is that the latter contains the additional element of "a receptacle communicating with the interior of * * * (the) sleeve" for the purpose of furnishing a supply of oil external to what is contained in the space between the "pervious body" and the "sleeve." The Court of Appeals for the Sixth Circuit did not discuss any difference between claims 3 and 4 and the former was withdrawn from consideration in the present suit.

The prior art before the Court of Appeals for the Sixth Circuit was much less impressive than that here. As new prior art we have first of all the British patent to Geipel No. 11,280 (A. D. 1894). The invention there related to improved methods of joining electric conductors whereby the insulation of the joint is more easily effected. The patentee says that after the joint is made the box "may be filled with a suitable insulating material, as for example, oil, wax, bitumen, or by a combination of any of these according to the nature of the insulation used for the conductor itself. * * * With paper or jute insulated conductors oil may be used."

In the United States patent to Lemp No. 534,802, the invention related to transformers or converters and was designed especially to provide a construction adapted to furnish the heavy currents employed in electric welding and other metal working apparatus. A reservoir is shown to contain a supply of oil. The patentee says when "the secondary has been placed around the primary and the proper liquid tight joints formed, as described, it is filled with oil, connection with a reservoir or supply pipe being maintained to allow for expansion under increase of temperature." Claim 11 of this patent is as follows: "11. The combination, substantially as described, in a transformer, of a tubular secondary inclosing the primary and filled with oil, and an oil reservoir or standpipe connected with said tubular secondary, as and for the purpose described."

In 1907, De Gelder, in a thesis written to obtain a degree in science at the Academy of Delft, described the Cable System of the Municipality of Amsterdam. While he was apparently dealing with cables having a relatively low tension, he says: "The impregnation of the paper insulation should take place with a rather thin liquid, oily and a not too resinous mass. It may be true that a dry, resinous mass gives a higher insulation resistance when measured, but it is much less resistive against breakdown." After setting forth the process of making the joint, he describes the immersion of the joint in the insulating fluid as follows: "After the soldering of the lead socket has been completed, a small square hole is cut in the top of the lead socket, and hot insulation mass is poured into the socket. For this purpose, the same mass, or rather the same oil, is used as for impregnating the cable. It is a kind of resin oil. After the socket has been filled, the hole is closed again by soldering."

De Gelder remarks in his thesis that German cables have a thicker mass of impregnating oil than do the British cables in which "a rather thin resinous oil is used at 15° C." He says that a thinner mass gives a better guaranty against breakdown than a harder one, and adds that: "The flowing of the mass from the junction boxes, caused by too intense heating, is more dangerous. In fact, if the mass is pressed out because of too strong heating, it is highly probable that, when contraction takes place, water will be sucked in, even though the junction box may be well sealed, * * * However, according to our observations the mass will not flow from correctly assembled junction boxes, such as those used by the Municipal Electric Works, until the temperature of the cable has become 90° C., which temperature doubtlessly will not be permitted to occur, for other reasons."

It is apparent from the foregoing that De Gelder understood that cables "breathe" under changes of temperature due to the pas-

sage of more or less current in the conductors and that the use of a thin oil is advantageous.

The use of a thin oil in the potheads of the Consolidated Gas Company of Baltimore in order to prevent the drying out of the ends of the cables illustrated the advantages of a thin liquid as compared with the paraffin which had formerly been used. This oil caused an impregnation of the wrappings of the cables for a considerable distance beyond the ends and demonstrated that there was a "breathing" process going on when the cables became hot, because the potheads then overflowed. This substitution of oil for paraffin in 1911, because it was found to be more advantageous, is authenticated by documentary evidence and the oil was used in connection with 13,000 volt cables. The supply of oil for replenishing the potheads was kept in barrels and drawn out through a spigot and under ordinary conditions of temperature had the consistency of molasses. It penetrated a long distance into the joint sleeves and dissolved the paraffin originally used as an insulator. The use of this oil demonstrated practically everything peculiar to Torchio's invention.

The Vernier article published in the Journal of the Institution of Electrical Engineers in 1911 on "The Laying and Maintenance of Transmission Cables" was produced at the trial of the present suit but was not before the Court of Appeals of the Sixth Circuit.

Vernier discusses the joining of Extra High Tension Cables and remarks that badly designed joints will prove a constant source of trouble. He warns against the presence of air with which he says "ionization no doubt takes place" and recommends boiling the insulating tapes to be used on the cables in oil and also saturating them with oil before wrapping so as to fill all crevices between layers and thus to exclude air pockets. He says: "Joints * * * may be filled either with an insulating oil or a joint box compound (of a solid or viscous nature). Oil is objected to by many engineers, who fear its being absorbed up the cores of the cables, and who therefore insist on a joint-box compound being used. Although one hears this absorption of the oil frequently mentioned, the author has yet to meet a case where a breakdown has occurred from this cause, and with cables impregnated under vacuum, as E. H. T. Cables always are, the leakage should in any case be very small." He adds that: "The author considers it important that a joint insulated in the manner shown * * * should be filled with oil" (Record, p. 774). And

says (at page 774) that the cores should be separated at intervals by bands of insulating tape "so as to allow the greatest possible freedom of access to the oil, which will keep the insulating tapes constantly impregnated, and this will be greatly assisted by the constant temperature changes which the cable undergoes under changes of load." These remarks show that Vernier understood the so-called breathing of the cables and realized that it would assist in forcing oil into the tapes and in filling any voids that have arisen. It is plain that Torchio did not discover the tidal action of the cable whereby as the temperature rises the oil is drawn out, and as the temperature falls it is sucked in again. Vernier not only understood it and set it forth in his article, but showed that it was of use in reimpregnating cables.

Vernier also realized that air would get into the cores and insulation of the cable when it was cut and the oil ran out and that this air pocket would cause a breaking of the joints due to sparking across the air space. This is the "bleeding" which Torchio is said to show how to repair. Vernier says that "an oil filling should in such cases be used" (Record, p. 775).

Vernier described the use of oil for the same purpose as did Torchio. It is perhaps true that he particularly recommended a joint box compound that is "viscous and of about the consistency of thick cream at ordinary temperatures," which "when heated * * * should run as freely as heated oil, so as to penetrate all crevices, and * * * must retain these features throughout its life." Such a compound, however, would not differ from that which the Court of Appeals of the Sixth Circuit held to infringe, for it would be an insulating liquid fluid at ordinary working temperatures of the cables and would meet the claims of the Torchio patent. But irrespective of the character of such a compound, Vernier described with considerable detail the use of an oil as distinguished from it, for the benefit of those who might desire to use the oil.

We can find nothing in claim 4 that is not fully disclosed in Vernier's article, but the separate "receptacle" for an additional supply of oil. Such a receptacle if it could be regarded as an element, which would create a patentable invention, was foreshadowed in the patent to Lemp. But the addition of this element does not render a claim otherwise invalid patentable. Westinghouse Elec. & Mfg. Co. v. Pittsburgh Transformer Co. (D. C.)

10 F.(2d) 593, at page 596; R. Herschel Mfg. Co. v. Great States Corporation (C. C. A.) 26 F.(2d) 362. Only distinctions that have no patentable merit can differentiate Torchio's claims from what has gone before.

The letter of Torchio to Smith of February 23, 1915, was only written fourteen days before Torchio filed his application for the patent in suit. It contained the following:

"Two weeks ago"—which would mean about February 9—"I mentioned to you and Mr. McCoy the hopes I entertained of having reached the solution by a form of joint which consists of making the splice by insulating it in the usual way, but wrapping around its outside insulating jacket a copper gauze, which is carefully held at the ends under the edges of the lead sheath, carefully pressed down, and by a lamp wick; the splice so made is then enclosed in a special sleeve, which is then filled under vacuum with a very light oil which penetrates and fills not only the insulation and voids in the splice, but also the disturbed ends of the cable. * * *

"With cables not operating at such high potentials as the New Haven service requires, it may still be desirable to adopt the same principle of filling the splice with a light oil and providing means for retaining the oil therein and preventing it from oozing out if perchance the annular space around the insulation in the splice is drained off, and does not retain in full, the light oil. For this purpose I have also tested two splices made without the metal armor and wick, but having the light oil in the outer space replaced by a heavy oil."

It is evident from the foregoing that Torchio was in much the same position as Vernier. Each was familiar with the use of a light oil and knew its advantages and some of its real or supposed disadvantages. Torchio, among other things, had in mind the use of "an insulating compound of greater density than said liquid to fill the space between the joint and the sleeve." This he mentions in his patent. He also had in mind a wire gauze envelope which would prevent the breakdown of the insulation between it and the lead sleeve even if cracks or voids happened to be formed in the insulation. These appear to have been novel features of Torchio's device which he described in the letter of February 23, 1915, and embodied in some of his claims. They do not appear in claim 4, all the elements of which were part of the prior art, both separately and in combination, with the exception of the receptacle for surplus fluid, which was not only shown in other devices but was an obvious addition if a supply of oil greater than the sleeve would hold were desired.

So long as Vernier or Torchio employed a liquid which was fluid at ordinary working temperature and would flow into the cable when the wrappings became dry or the oil was sucked out by the breathing process, the desired result was effected. Each seems to have had the same thing in mind. Torchio was seeking to avoid the old fluid compounds which hardened and cracked when they cooled and consequently let in air and failed to permeate the wrapping and filling. He provided no particular quality of oil, but like Vernier one of such fluidity that by the breathing of the cable it would be drawn in and out of the joint.

The District Court held the patent invalid in view of the prior art and dismissed the bill. With this we agree.

Decree affirmed.

MANTON, Circuit Judge, dissents with opinion.

MANTON, Circuit Judge (dissenting).

With the statement of claims of the patentee as set forth in the prevailing opinion I agree. The patent in suit has features of novelty. The immersion of the joint in an insulating medium, fluid at ordinary working temperatures and adapted to permeate the pervious wrapping, and the provision for the reservoir of fluid in addition to that carried in the joint sleeve constituted novelty. The oil within the joint sleeve flows or migrates in time into the cable, sometimes for great distances beyond the joint, and the deficiency of the oil is made up in the joint by oil flowing out of the reservoir. This is covered by claim 4, the one claim in suit. It is the flowing of the oil which continuously takes place throughout the cable which eliminates the dangerous voids, and the inventor overcame losses of electrical current by this invention, avoiding breakdowns of the joints or of the cables.

An examination of the prior art convinces me that he was the first to discover the so-called breathing of the cable which would soak in the oil thus filling the crevices or voids. The Circuit Court of Appeals for the Sixth Circuit [Metropolitan Device Corp. v. Cleveland Electric Illuminating Co., 36 F.(2d) 477] sustained this patent.

The prior art, referred to in the prevailing opinion, does not disclose this invention.

The problem was to restore the lost insulation. Prior to the patent in suit, the teaching had been that the insulating compound in the joint should not be soft enough to flow. The thought was that the compound should not be permitted to escape and leave the joint unprotected. The patentee substituted a liquid insulating compound for the compound with a low melting point theretofore in use with the cable sleeve. The liquid compound would and did, especially under pressure, flow on the cable length.

The insulating schemes referred to by the Vernier patents, dealing in prophecy, have no description of an actual joint in service. Vernier does refer to insulating oil, solid compound, and viscous compound. He says that there should be very little leakage of oil up the cores and that such leakage could be absolutely prevented. He did not have the conception of the migration of oil caused by the breathing of the cable and his remedy was to prevent leakage and not to provide oil in quantities sufficient to compensate for it. His recommendation was for viscous compound and the important thing about this was its opposition to mobility. In his patents, the outer joint box did not have a reservoir, while the patent in suit does, and has a sufficient quantity of oil to supply, at all times, the demands made by the cable and joint by the breathing operation.

The Geipel patent did not provide for pervious wrapping of the cable ends in the joint box. The oil does not fill the joint casing and the cable ends project above the surface of the body of oil.

The De Gelder paper describes joints working on the reverse principle of the joints referred to in the patent in suit. The joints spoken of are not used in high-tension cables and the paper speaks of an impregnated mass not too soft or too thinly liquid. It refers to the flowing of the mass from the junction boxes caused by too intense heating as "more dangerous"; it also refers to resinous oil and a thicker mass. This is contrary to the thought of the patent in suit, which was to have the liquid soaking or flowing.

The letter of the patentee refers to his wide experimentation and difficulty he experienced in overcoming the idea of using compounds other than liquid oil. He shows that he had been adverse to the use of oil at first, but was converted to its use just before filing his patent application. Infringement is clearly established.

The judgment should be reversed.