## McEUEN v. KELLEY-KOETT MFG. CO.

### No. 4131.

District Court, E. D. Kentucky.

Aug. 6, 1940.

Cushman, Darby & Cushman, of Washington, D. C., and Allen & Allen, of Cincinnati, Ohio, for plaintiff.

Murray, Sackhoff & Paddack, of Cincinnati, Ohio, for defendant company.

SWINFORD, District Judge.

This is an action to recover for an infringement of patent No. 2,040,441 issued to the plaintiff, Dr. H. B. McEuen, upon his application filed on February 15, 1930.

The invention is a type of X-ray machine used for treatment of deep seated growths and cancers. The treatment is medically termed "deep therapy" as distinguished from skin treatment.

The plaintiff prays that:

1. A finding of infringement and validity of the patent be made, and, 2. The defendant be adjudged guilty of a breach of trust and betrayal of confidence by reason of its conduct over a long period of years from the date of the disclosure of the plaintiff's invention to the defendant.

The plaintiff is a practicing physician who has specialized in X-ray work since 1911.

The defendant is a manufacturer of X-ray machines and related apparatus. It is apparent from the record that the plaintiff was a customer of the defendant and was somewhat acquainted with officials of the company.

To establish its second contention plaintiff has introduced a large amount of correspondence relative to the patent in suit between the plaintiff and the defendant beginning on December 10, 1929, and continuing over a period of years until their final disagreement which preceded the filing of the suit.

It is contended by the defendant that plaintiff's invention was anticipated by the prior art. In other words, that there was no invention. It is contended in defense of plaintiff's second claim that there was no confidential relationship between plaintiff and defendant and that defendant had not used any of plaintiff's ideas gained through the correspondence or their discussions of plaintiff's machine indicated in patent No. 2,040,441.

The plaintiff does not contend that he has created any element or mechanical device that has not hitherto been known and used efficiently, but that his contribution to the art was a novel combination of various known features, which combination was not before known and which proved to be an outstanding advance in the art. He rests his case on the rule that a new combination of known elements which produces a new and beneficial result is invention. Webster Loom Company v. Higgins, 105 U.S. 580, 26 L.Ed. 1177.

The rule is well stated by the Circuit Court of Appeals for the Sixth Circuit in the case of Metropolitan Device Corporation v. Cleveland Electric Illuminating Co., 36 F.2d 477, 479: "Nor was plaintiff's invention anticipated by the prior art. The cable, the insulating compound, the sleeve with its soldered joint, and possibly the

cable joint construction, were all old, but they were not old in combination. In the new combination they produced a new result and therefore were not anticipated. Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177; Detroit Carrier & Mfg. Co. v. Dodge Bros. [6 Cir.], 33 F. (2d) 743, 747; Michigan Carton Co. v. Sutherland Paper Co. [6 Cir.], 29 F. (2d) 179, 183; Ferro Concrete Const. Co. v. Concrete Steel Co. [6 Cir.], 206 F. 666, 669; Kellogg-Switchboard & Supply Co. v. Dean Electric Co. [6 Cir.], 182 F. 991, 998."

Pitching his case upon this theory of the law the plaintiff contends that prior to his invention the practice of the deep therapy treatment was limited and hampered because by using the necessary high voltage of electricity which the treatment required in machines then known there was grave danger of shock to the patient and operator and no X-ray tube could withstand the excessive heat required to produce the sufficient X-rays.

This was due to the fact that a very small portion of the electrical energy is converted into X-rays while approximately ninety to ninety-nine percent of the energy is dissipated in the form of heat at the point of the anode.

The following diagram will enable the reader to better follow the explanation which I think is important to an understanding of this opinion:

This diagram, which is plaintiff's exhibit M–1, portrays the X-ray tube in Fig. 1.

The cathode pole of the tube is identified by No. 16.

The anode pole is identified by No. 13 stem and No. 14 button. As a result of the construction of the anode it is unable to withstand the heat thrown off by sufficient electrical energy to produce adequate X-rays to make effective treatment.

By the plaintiff's invention he has through the use of circulating dielectric oil cooled the anode until it functions at an excessive high potential without damage to the tube. By the use of dielectric oil and non-conductor connections between the tube and the cooling system has stopped the shock at its source instead of trying to deal with it after it returns to the cooling system.

This result is produced by a new use of elements and mechanical devices identified here as claims 4, 6, 7, 10, 12, and 14, the claims alleged to be infringed.

It is therefore stated that the invention has for its primary object the production of an X-ray tube in which the anode is powered for a materially increased target or focal spot area, and in which the tube may be subjected to a continuous and effective heat dissipation under an operating energy that greatly exceeds prior types of machines. To produce this effect there must be provision for contraction and ex-

pansion of the tube by the mechanism used to support or hold the tube in place. There must be means for effective heat exchange with the anode for complete cooling purposes, coupled with means whereby the cooling medium is insulated from the high potential energy and is maintained at ground potential.

The insulating medium (dielectric oil used in the McEuen invention) circulating continually through the apparatus surrounding the tube at its anode end from the point of the anode to an external cooling system seems to completely insulate the parts of the apparatus and keep them cool.

Figure 1, above, is a view of the apparatus.

Figure 2 is a section in line 2 of Figure 1.

Figure 3 is a sectional detail showing the mounting of the anode end of the tube.

It must be borne in mind that it is only with the anode end of the tube that this invention claims to produce new effects. The cathode, No. 16, is the conventional type.

The external cooling unit with its various parts indicated by small numbers is in a casing 40.

The dielectric oil is carried through the pipe or coil 39 which passes through water circulating around the coil 39 within the casing 40. The dielectric oil passing from the anode end of the tube to the external cooling system through insulated (bakelite) tubes 29 and 30 are connected by flexible couplings 31 with tube sections 32 and 33.

This oil passes from the external cooling system through pipe 35 and on down through 30 into the anode to the point near the target. It thus efficiently cools the anode and then returns to the cooling system through 33, 29, 34, through 38 into the casing where the cooling medium (water usually) is circulating.

To allow for the necessary expansion of this glass tube the inventor provided in the circulating line, I have just followed, leading into and out of the anode, a flexible arrangement, so that on such expansion or contraction the pipe connections 31 would yield and prevent fracture of the glass tube. Figure 3 in the diagram above set out shows a ball bearing arrangement so that as the tube expands the support 15 can slide back and forth in the ball bearing arrangement at the same time the pipe connection yields.

Before going further, I should point out that Figure 2 in the diagram is principally to exhibit the casing which surrounds the X-ray tube. As has been pointed out, the tubes are operated at extremely high voltage and this casing 47 surrounding the tube, maintained at ground potential for the protection of the operator and patient. Any contact with the high voltage would undoubtedly be fatal.

Thus the plaintiff by producing this shock proof machine through a new combination of known devices has contributed a practical and safe method of administering the deep therapy treatment.

The claims which are alleged to be infringed are:

"4. In an X-ray apparatus, a casing, a cooling system external of said casing, an X-ray tube within the casing, circulating connections leading through the casing for directing dielectric oil for cooling and insulating the anode of the tube, said oil being maintained at ground potential, said circulating connections being in part of insulating material to prevent the high potential of the tube from charging the cooling system beyond the casing, said circulating connections being in flexible connection with the tube, whereby to permit independent movement of the tube under expansion and contraction without interfering with the oil circulation."

"6. In an X-ray apparatus, a casing, an X-ray tube within the casing, a conduit of insulating material flexibly connected to the tube for leading a dielectric oil into the anode of said X-ray tube, and means for providing for the discharge of the hot oil from the tube to and through the wall of the casing, said discharge means being in part of insulating material and preventing contact of the dielectric oil with the external or other portions of the walls of the X-ray tube."

"7. In an X-ray apparatus, a casing, an X-ray tube within the casing and including an anode, means for circulating a dielectric oil from a point beyond the casing to and within the anode, said means insulating sections carried by and rigid with the casing to insulate said tube for preventing leakage of the high potential of the anode, said insulating sections being flexibly connected to the tube."

"10. In an X-ray apparatus, a casing, an X-ray tube therein, insulated connector posts carried by the casing and supporting the tube, means for removably fixing the cathode end of the tube to one of said posts, means for mounting the anode end of the tube for free axial movement of the tube under expansion and contraction, circulating connections for a dielectric oil opening within the anode of the tube, and flexible connections in said circulation connections to permit axial movement of the tube under expansion and contraction without interfering with oil circulation."

"12. In an X-ray apparatus, a casing, a tube within the casing including an anode, means leading from a source beyond the casing for circulating dielectric oil to, within, and from the anode, said means having flexible connection with the tube and rigid connection with the casing, said means insulating the casing from the high potential of the tube."

"14. In an X-ray apparatus, a casing, an X-ray tube therein including an anode, a source of dielectric oil beyond the casing, tubes leading from said source through and being fixedly supported by the casing and to and within the anode for circulating the dielectric oil within the anode, said tubes in the lengths between the anode and casing being of insulating material and of flexible connection with the anode, whereby to insulate the casing and source of dielectric oil beyond the casing from the high potential of the anode."

It is contended by the plaintiff that these claims are infringed by the defendant in two of its machines which have been placed on the market both before and since the date of issue (May 12, 1936) of the patent in suit.

The record discloses that the first connection which plaintiff had with the defendant and some of its employees was December 10, 1929. From that time on it appears that the parties were in constant touch with each other. There was considerable correspondence. There was a visit or two by Mr. William S. Werner, who served in various official capacities, with the defendant company from secretary-treasurer to president between the years 1932 and 1936. Mr. Werner had died at the time of the trial of this case but it was in evidence that all of the plaintiff's secrets in connection with his invention had been disclosed from time to time to Mr. Werner. Mr. Werner discussed with the engineers of the defendant company the designs of the machines in process of development or invention and dictated to them the proceedings of what they were going to build.

It was during this time and after the full disclosures of his invention had been made to the defendant through Mr. Werner, that the two machines which it is claimed infringe plaintiff's patent were designed and built by the defendant. These two machines were the Theron or No. 12 Tube Stand, plaintiff's exhibits A and B, and The Superay 400, plaintiff's exhibit E.

The record discloses the following chronology of events:

Plaintiff's first contact with the defendant, from the standpoint of this invention, December 10, 1929.

The plaintiff presented application for the patent in suit to the defendant May 20, 1932.

The defendant developed the No. 12 Tube Stand in about February, 1934, at the earliest late in 1933.

Produced The Superay 400 in February, 1936.

Throughout this period of time there was much correspondence and discussion between the plaintiff and the defendant's Mr. Werner, who was in more or less of a supervisory capacity over the construction engineers that produced the two machines in question which have been successfully developed and marketed by the defendant.

To compare these two machines with the plaintiff's machine would serve no good purpose from a legal standpoint and would add nothing to this opinion. There is a marked similarity in construction and design. It is apparent that the two machines were constructed with the end in view of accomplishing the same thing that McEuen had in mind in the construction of his machine. In the defendant company's No. 12 Tube Stand there is a flexible connection as shown at 31 in the diagram. There are the Bakelite connections as indicated in Nos. 29 and 30. The cooling system is external to the tube casing. While the design of this No. 12 Tube Stand is different it presents a unit for the use in deep therapy treatment which combines features not before combined for a like function.

Also, The Superay 400 shows a marked similarity to the patent in suit in combi-

nation of mechanics and elements. An arch form. An X-ray tube in the casing. An external circulating oil cooling system. Emphasizing that the combination of the oil cooling system and the bakelite tubes within the casing stop the high potential of the anode at its source and thus cuts it off from the casing and the external cooling system so that both remain at ground potential when the current is on and the machine is in use. The Superay 400 shows the copper "U" shaped oil connections rigidly fixed to the casing thus providing a flexible connection with the anode and of the X-ray tube.

Many patents were introduced into the record to show that each of the functions claimed by the plaintiff were known to the art. This is acknowledged by the plaintiff. But, he contends the art, prior to his invention, did not have a construction wherein the advantages of the large external cooling unit could be availed of, yet wherein no exposed parts of the cooling system were at the high and dangerous potential of the anode.

It seems that the law is well settled in this respect.

■ The rule is laid down in the case of Parks v. Booth, 102 U.S. 96, 104, 26 L.Ed. 54: "Where the thing patented is an entirety, consisting of a separate device or of a single combination of old elements incapable of division or separate use, the respondent cannot make good the defence in question by proving that a part of the entire invention is found in one prior patent, printed publication, or machine, and another part in another, and so on indefinitely, and from the whole or any given number expect the court to determine the issue of novelty adversely to the complainant. Bates v. Coe, 98 U.S. 31 [25 L.Ed. 68].

"Common justice forbids such a defence, as it would work a virtual repeal of so much of the Patent Act as gives to inventors the right to a patent consisting of old elements, where the combination itself is new and produces a new and useful result. New elements in such a patent are not required, and if such a defence were allowed, not one patent of the kind in a thousand of modern date could be held valid."

This rule has been followed consistently in testing inventions in infringement cases and abundant authority can be found in more recent years.

■ I am of the opinion that Dr. McEuen has met the test laid down in this rule and that he made a distinct and new contribution to the art by the invention of his machine and that the patent properly issued. .

■ I am also of the opinion that defendant took advantage of a confidential relationship and the ideas of McEuen were appropriated by the defendant in the building of its No. 12 Tube Stand and The Superay 400.

The large volume of correspondence coupled with Werner's visit to the plaintiff's home and their discussion at other meetings cannot be ignored. The Court cannot) accept as a coincidence the fact that these strikingly improved machines did not appear until after McEuen's genius produced such a machine.

The deep therapy treatment is distinctly advanced by the appearance of a machine which can be used with much less danger of shock to the patient and operator.

The defendant company with years of experience and with engineers and employees devoting all of their thoughts to such equipment had made no such discovery.

In the case of Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923, the court said: "It is argued that there was no confidential relationship existing between complainant and defendant with respect to the disclosure of complainant's invention; but this contention is groundless. Complainant offered to disclose his invention to defendant with a view of selling it to defendant, and so stated in his letter. Defendant was interested in the proposition and invited the disclosure, otherwise it would not have seen complainant's specification and drawings until the patent was granted. While there was no express agreement that defendant was to hold the information so disclosed as a confidential matter and to make no use of it unless it should purchase the invention, we think that in equity and good conscience such an agreement was implied; and having obtained the disclosure under such circumstances, defendant ought not be heard to say that there was no obligation to respect the confidence thus reposed in it."

It is with some difficulty that the Court is forced to the conclusion that an advantage has been taken of the plaintiff by a firm of the reputation and standing of the

defendant. Nevertheless, it would seem only fair that Werner should have ceased contact with the plaintiff while he was assisting in the design of machines that emphasized features about which McEuen, relying on his judgment and experience, was writing him. He could not ignore this knowledge acquired from McEuen when he was advising the construction of the two machines, No. 12 Tube Stand and The Superay 400.

Corporations and persons in the business of handling and making new devices have a distinct advantage over the individual inventor who is compelled by circumstance to divulge his secrets to them. These secrets often times are for the benefit and blessing of humanity and courts should require the highest degree of trusteeship. Otherwise, there might be a tendency to delay the development until the author of the idea through necessity must sacrifice his property right for the sake of a greedy commercialism.

A case from the Seventh Circuit Court of Appeals is in point here. Booth v. Stutz Motor Car Co. of America et al., 56 F.2d 962.

The plaintiff should recover in accordance with the prayer of his petition except that no exemplary damages be awarded.

All proper orders in accordance with this opinion should be drawn and submitted.