## COLD METAL PRODUCTS CO.
### v.
### NEWPORT STEEL CORP.
#### No. 516.
United States District Court,
E. D. Kentucky, Covington Division.
March 8, 1954.

William H. Webb, Morton Burden, Jr.,. Pittsburg, Pa., J. Mack Swigert, Cincinnati, Ohio (Webb, Mackey & Burden, Pittsburg, Pa., Taft, Stettinius & Hollister, Cincinnati, Ohio, of counsel), for plaintiff.

Cyrus G. Minkler, John C. Sterritt, Arthur W. Dickey, Detroit, Mich., Frank V. Benton, Frank V. Benton, Jr., Benton, Benton & Luedeke, Newport, Ky. (Harness, Dickey & Pierce, Robert L. Boynton, Detroit, Mich., of counsel), for defendant.

SWINFORD, District Judge.

This is an action brought by the plaintiff, The Cold Metal Products Company, an Ohio corporation, against the Newport Steel Corporation, a Delaware corporation, having a mill and an established place of business in Campbell County, Kentucky, in this district, where the infringing acts complained of are alleged to have been committed.

The plaintiff became the owner by assignment of all three of the patents in suit in 1942 and title to the patents has been held by the plaintiff throughout the entire period of the alleged infringement. The patents in suit are:

Keeney and Ferm 1,918,968 dated July 18, 1933
Steckel 1,977,214 dated October 16, 1934
Montgomery 2,087,065 dated July 13, 1937.

The plaintiff asks for both preliminary and final injunctions against alleged further infringement of Letters Patent Nos. 1,977,214 and 2,087,065, and for an accounting of profits and damages arising out of the defendant's alleged infringement upon each of the Letters Patent Nos. 1,977,214, 1,918,968 and 2,-087,065.

The defendant by its answer pleads a number of defenses but relies primarily upon the usual defenses in actions of

this character; that is, noninfringement and the invalidity of the patents.

The rolling mill of the defendant is a 2-stand reversing mill for the hot rolling of steel strip or sheets, comprising a roughing mill, a finishing stand, roll tables for supporting the material, coilers and coiler furnace on opposite sides of the finishing stand for coiling the material as it is passed back and forth between the reducing rolls of the finishing stand, and a final coiler for receiving the completed material. The mill was installed in the early part of 1949 and has been in operation since that time. The mill in its regular operation rolls large tonnages, in excess of twenty thousand tons of steel per month.

The instant case is concerned only with the specialized branch of general steel rolling art in which relatively thin sheets or strip-like material is hot rolled. These strips can be reduced to various degrees of thickness. Hot rolled sheets and strip are ordinarily from 3/16 of an inch to .050" in thickness and may vary in width up to 80" or more. They also vary in length, depending, of course, upon the thickness and width desired, but may run from a few feet to several hundred feet long. The mill in question only rolls flat steel in strip form. The rolling of this hot strip is a specialized art which is divided from the rest of the rolling art. Its products are used for automobile body frames, metal rims for automobiles, guard rails, heavy stampings, tubings, automobile oil pans, steel decking, and as the starting material for the manufacture of cold rolled tin plate.

The history of the development of sheet-like steel is interesting and important. This background is not necessary, however, to the determination of the issues. It should be pointed out that modern industry and manufacturing produced a demand for hot roll strip or sheet-like material with a high ratio of width to thickness. This demand remained unsatisfied until 1927. The demand was met in a large measure by the invention and erection of what is referred to in the record as the 4-high anti-friction bearing continuous mill.

This continuous mill, it is admitted by the plaintiff, produced the desired type of material. It was necessarily large, by being continuous, required a large area on which to be constructed and was very expensive to construct and operate. These two factors, expense and space, made it unavailable to the smaller steel producers. The demand for a less expensive and smaller mill resulted in the construction of the coiler arrangement on either side of the finishing mill for the coiling and passing back and forth, by use of the coilers, the hot roll strip through the finishing mill. One of the decided advantages of the reversing mill is the speed with which the strip can be rolled. Prior to 1927, when the mechanical process came into operation, the only way in which wide sheets could be produced was a manual operation of such hot, arduous work that repeated heating of the metal in the process was necessary. Only limited lengths of from 8 to 10 feet could be rolled and, of course, the weight of a wide sheet made it impossible of production by manual labor. Under the old system the weight of the sheet was only about 70 to 90 pounds. The weight of a single strip rolled in the defendant's mill is from 9,000 to 18,000 pounds. The maximum speed under the old system was about 250 feet per minute. This should be contrasted with the speed of the defendant's mill of from 600 to 1,000 feet per minute.

The single stand reversing mill having coilers and coiling furnaces on opposite sides of the mill stand first came into use in 1927. This is only a portion of a rolling mill but it is that portion with which we are concerned in this action. The other features of the process of rolling steel are, of course, necessary and of prime importance but we are not concerned with the mechanism of the steel mill outside of the coilers. Our problem concerns only the treatment of the hot rolled strip after it reaches the entry coiler and before it is passed on to the roll table beyond the exit coiler to the runout table or roll table.

882

The defendant's mill charged with the infringement, is portrayed in Exhibits A and B filed with the stipulation as to the structure and operation of defendant's hot strip mill. At the trial of the case these exhibits were again produced in the record by larger drawings and diagrams which are identified as Plaintiff's Exhibits Nos. P–6 and P–7. The diagrams are herewith set forth as a part of this opinion.

The functions of the defendant's mill, as revealed from the record and with reference to the diagrams and exhibits, in

producing the hot roll strip from the ingot is described as follows. The steel is produced from the blast furnace in the form of an ingot in which form it is ready for finishing by rolling. The in- got is placed in a soaking pit where it is heated to a temperature of 2350 degrees Fahrenheit. The soaking pits are not shown in the diagrams. After being withdrawn from the soaking pit the in-

NEWPORT HOT STRIP MILL REVERSING FINISHING STAND AND COILERS

got is placed on the roll tables and carried to the edger. It is passed through the edger, backward and forward three times, and then carried by another roll table to the roughing mill. Before it enters the roughing mill it is descaled by a water pressure system. It passes through the roughing mill three to five times and returns to the edger for two more edging passes. From the edger it is returned to the roughing mill for further descaling and another three to five passes through the roughing mill. It is then returned to the edger for two more passes and again returned to the roughing mill for from three to five passes. After the last pass through the roughing mill the strip then travels over four roll tables to the shear where from fifteen to twenty feet are cut from the front end. The strip is then passed into the roller hearth furnace. As the trailing end comes to the cropping shear approximately three feet are cropped from the trailing end. The strip stops momentarily for each of these shearing or cropping operations.

The strip then enters the roller hearth furnace for three and a half to five minutes. Here the heat that has been lost since the metal came from the soaking pit is restored. The strip is then brought through an eleven roll scale breaker and high pressure descaling water, through the entry coiler furnace and through the reducing rolls in the 4-high finishing mill.

After the strip has passed through the reducing roll of the 4-high stand it proceeds through the side guides onto a roll table, is directed into the exit coiler furnace by the raising of what is designated as the "finger" (a part of the roll table) and the raising of the bending roll (a part of the roll table) and into the coiler reel. Through the mechanism of this coiler reel the strip is rolled until the entire strip has been coiled within the coiler furnace except the trailing end of strip which has cleared or gone through the reducing rolls and which has been stopped on the roll tables before entering the coiler furnace. When the trailing end of the strip has reached a point on the roll table between the 4-high finishing stand and the exit coiler furnace, the coil, insofar as that particular movement, is completed. The reel is then reversed and the trailing end is pushed back into the reducing rolls and is guided by the side guides over the roll table, lifted by the finger and bending roll onto the reel of the entry coiler where the strip is coiled in the same manner as in the exit coiler until the trailing end (formerly the front) reaches a point on the roll table between the entry coiler and the finishing stand. This process is followed until the strip has made five complete passes through the reducing rolls of the finishing stand. The strip is then carried by the roll tables through the exit coiler down the table line runout tables to a finishing coiler where the finished strip is coiled on a mandrel type coiler with wrapping rolls around this coiler, where it is subsequently weighed and stored.

The plaintiff alleges infringement of numerous claims. Insofar as the Keeney and Ferm patent is concerned, it is urged by the plaintiff that the combination of mechanisms used by the defendant in the construction of its mill infringed Claims 2, 5, 10, 16, 17, 18, 19, 20, 22 and 23 of this patent. The specific mill shown in the drawings was never built but it is represented to the court by the record that the features were incorporated in the construction of a substantial number of mills and were used in the construction of mills following the line of the Steckel patent No. 1,977,214.

Claim 2 provides for reducing rolls, a pair of heating chambers arranged one on each side of the rolls and each having an opening for the passage of the strip. There is a means for supplying heat to each chamber, a winding reel mounted in each chamber and a means for guiding the strip from the rolls to each reel and securing the strip to the reel. There is a means for operating each reel and winding the strip on the reel and a method for returning the strip from each reel to the rolls.

Claim 5 provides for reducing rolls, winding reels, a guide for the strip adjacent to the reel and means for moving the guide to and away from the reel.

Claim 10 is similar to claims 2 and 5 but differs with them in calling specifically for mill tables on opposite sides of the reducing rolls and requiring "chutes", leading from the reducing rolls to the coiling reels, which are movable to lie clear of the material on the mill tables.

Claim 16 provides for the tables on either side of the mill to support the strip from the time of issuance from between the rolls until it has been fed back through the mill stand. It provides for coilers adapted for automatically and mechanically reeling and paying out material rolled on the mill after the material has been thinned and elongated.

Claim 17 provides that there is a "means for maintaining the coiled material at elevated temperature".

Claim 19 recites a means for guiding the material to the coilers.

Claims 20 and 22 seem to cover the same field and appear to me to be well covered in the preceding claims in all the elements which they recite.

Claim 23 calls for "chambers above the plane of the tables containing the coilers, the chambers being arranged to prevent loss of heat of the coiled material".

In the Steckel patent, 1,977,214, it is contended that the defendant has infringed five claims indicated as 4, 5, 12, 18 and 22.

Claim 4 provides for a table on either side of the mill to support a flat piece of material from the time of issuance thereof from between the rolls of the mill until it has been fed back through the mill. It provides that these tables shall be adequate to support the material while it is relatively thick and in an uncoiled state.

The claim also provides for coilers adapted for automatically reeling and paying out material rolled on the mill when it has been thinned and elongated

and that sections of the table should be movable to divert the material from the tables to the coilers.

Claim 5 provides a combination with a rolling mill, and a mill table on each side of the mill arranged to support the material while it is being rolled back and forth through the mill. It provides a method of deflecting the material upward from the plane of the tables, a coiler on either side of the mill for engaging and coiling the material, and for chambers above the plane of the tables containing the coilers and arranged to prevent the loss of heat in the material.

Claim 12 is a method of rolling hot strip to such thickness as to permit of coiling it, subjecting it to repeated reducing passes and coiling it between passes. This claim provides for the removing of scale from the material between passes.

Claim 18 provides for roll tables on each side of the mill, coilers above the roll tables and that sections of the table be movable to divert the material upward to the coilers.

Claim 22 is similar to claim 18 except that it describes the coilers of claim 18 as reels which coil material from the mill and feed it back to the mill. This claim also calls for "heat conserving chambers" which are around the reels and above the roll tables. In addition the claim provides for kick-ups for diverting the material from the roll tables through the bottom of the chambers to the reels.

The plaintiff contends that the Montgomery patent, 2,087,065, is infringed in all five of its claims.

Claim 1 provides "a method of rolling metal strip, the steps consisting in supplying to a roughing mill a heated slab-like body which is too thick for coiling, rolling the body in the roughing mill until it is substantially thin enough to permit of coiling, but maintaining the thinned body in the flat state * * *." The same heat is retained and the thinned body is fed to a reversing mill in successive passes therein to reduce it

to a desired strip thickness and coiling it between passes in the reversing mill.

Claim 2 is the same as claim 1 but adds thereto the step of trueing the edges in the roughing mill.

Claim 3 provides for the reversing of the strip through the roughing mill.

Claim 4 is the same as claim 1 except it requires that the material be rolled in the roughing mill "until the body cools to a temperature below that at which free scale forms  *  *  *."

Claim 5 calls for feeding the strip "after cropping at least one end of the thinned body to facilitate its entry into said reversing mill  *  *  *."

█ It is proper to first consider the defense of invalidity of the patents in suit. In attacking the validity of a patent the burden rests upon the party who avers it. Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983; Williams Manufacturing Co. v. United Shoe Machinery Corporation, 6 Cir., 1941, 121 F.2d 273, affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537.

The plaintiff does not contend that its inventions created any element of mechanical device that was not hitherto known to the art and used efficiently, but that the patents presented a novel combination of various known features, which combination was not before known and which proved to be an outstanding advance in the art. It rests its case on the rule that a new combination of known elements which produces a new and beneficial result is invention. Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; McEuen v. Kelley-Koett Mfg. Co., D.C., 34 F.Supp. 351. The rule of law upon which the plaintiff relies is expressed by the Court of Appeals for the Sixth Circuit in Metropolitan Device Corporation v. Cleveland Electric Illuminating Co., 36 F.2d 477, 479:

"Nor was plaintiff's invention anticipated by the prior art. The cable, the insulating compound, the sleeve with its soldered joint, and possibly the cable joint construction,

were all old, but they were not old in combination. In the new combination they produced a new result and therefore were not anticipated."

Patents on combinations of known mechanisms have been discussed by the same court in the recent case of Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 210 F.2d 146.

The recommendation of the use of the mills described in the patents is that these mills can be constructed in a smaller area and for much less cost; that they fill the need of the small producer and manufacturer of steel. I find no authorities to justify a consideration of relative size and lesser cost as elements to be considered in determining patentability.

A glaring weakness of the plaintiff's case is that all of the results achieved by the claims of the patents and by the defendant's mill were produced by the antifriction bearing continuous mill. The record is barren of any distinction in the use of any of the elements of the patents in suit in the handling, rolling and finishing of hot roll strip, by the reversing process with coilers set at a distance of approximately twenty five and twenty three feet from the finishing stand by which the strip is repeatedly reversed and sent through the finishing stand, and the process utilized in the antifriction bearing continuous mill.

The distinguishing features between the mills portrayed in the patents in suit and the antifriction bearing continuous mills are the coilers with heating chambers. Such coilers were well known to the art in cold rolling. In studying their relation to the rolling of hot strip the testimony of A. P. Steckel, inventor and patentee of the patent in suit No. 1,977,-214, is important and significant. Prior to the issuance of the Steckel patent in suit there was issued to Steckel Patent No. 1,857,670 on May 10, 1932. This patent made three claims. They are short and I copy them in full herein.

"1. The method of rolling metal strip which includes coiling a strip of hot metal in a heating chamber,

uncoiling the same and feeding it from the chamber through a roll pass and to another heated chamber, coiling the strip therein in a direction opposite to that in which it was first coiled, and periodically reversing the direction of rolling.

"2. The method of rolling metal strip which includes coiling a strip of hot metal in a heating chamber, uncoiling the same and feeding it from the chamber through a roll pass and to another heated chamber, coiling the strip therein in a direction opposite to that in which it was first coiled, periodically reversing the direction of rolling, and maintaining the metal under tension between the rolling thereof and the coiling thereof.

"3. The method of rolling strip metal which includes coiling a strip of hot metal in a heating chamber, uncoiling the same and feeding it from the chamber through a roll pass and to another heated chamber, coiling the strip therein, periodically reversing the direction of rolling so that the material is fed back and forth from one coil to another, and subjecting the material to bending in both directions so as to effect removal of scale."

It is seen from the language of these claims that the coiler with heating chamber on each side of the finishing stand for reversing the hot roll strip back and forth through the finishing stand was of functional use to the comparatively reduced size mill prior to any of the patents in suit. Steckel claims credit for the first idea of using the heated chambers and coilers with coiling reels for the finishing of hot roll strip. He states in his evidence that he regards himself as the original inventor of a mill of such design and use. If Steckel is correct, and there is nothing in the record to dispute his claim, the combination of known mechanisms produced by Keeney and Ferm, Montgomery, and Steckel in their patents was anticipated by the Steckel patent of 1932, No. 1,857,670.

Since the only claim of the plaintiff is that these patents show invention by reason of a combination of known mechanisms of such originality that the mill designed rises to the dignity of invention we will look at the cases covering such a claim. The court must, of course, recognize the primary fact that the patents were issued by the United States Patent Office. It must be accepted as a fact that thorough investigation and the application of principles of law were considered and applied by this administrative agency. It must be accepted as a fact that the patents would not have been issued had the patent office not been convinced that there was invention. It is assumed that a mechanism arising to the dignity of a patent vests in the inventor a lawful right which he has earned and which should not be lightly brushed aside by the court. Protection and monopoly of the patent for the prescribed statutory period has been recognized by Congress as something which is not only essentially fair to the individual but contributes much to the well being and protection of the whole people. It should be the duty of the courts, it seems to me, to interpret the law in such a way that the individual inventor is encouraged in his efforts rather than discouraged from making an effort.

In Westinghouse Electric and Manufacturing Co. v. Quackenbush, 6 Cir., 1931, 53 F.2d 632, the court said that claims must be read and construed in the light of the specifications and so liberally interpreted as to uphold and not destroy the right of the inventor in the substance of his invention. In that opinion the court cited in support of this rule Southern Textile Machinery Co. v. United Hosiery Mills Corp., 6 Cir., 33 F.2d 862, and Sun Ray Gas Corp. v. Bellows-Claude-Neon Co., 6 Cir., 49 F.2d 886.

An excellent statement of the rule is found in the case of O'Rourke Engineering Const. Co. v. McMullen, 2 Cir., 1908, 160 F. 933, 938, where the court said:

"The principal question in such cases is: Has the patentee added

anything of value to the sum of human knowledge, has he made the world's work easier, cheaper and safer, would the return to the prior art be a retrogression? When the court has answered this question, or these questions, in the affirmative, the effort should be to give the inventor the just reward of the contribution he has made. The effort should increase in proportion as the contribution is valuable. Where the court has to deal with a device which has achieved undisputed success and accomplishes a result never attained before, which is new, useful and in large demand, it is generally safe to conclude that the man who made it is an inventor. The court may resort to strict and, it may even be, to harsh construction when the patentee has done nothing more than make a trivial improvement upon a well known structure which produces no new result; but it should be correspondingly liberal when convinced that the patentee's improvement is so radical as to put the old methods out of action. The courts have frequently held that one who takes an old machine and by a few, even inconsequential, changes compels it to perform a new function and do important work which no one before ever dreamed it capable of performing, is entitled to rank as an inventor."

It is true, as pointed out by counsel in briefs, that the claims of prior patents which were considered as having possibly anticipated the invention claimed by Keeney and Ferm, Steckel, and Montgomery were considered and rejected by the patent office and notwithstanding these claims by other patentees the patents in suit were issued.

■ The court's attention is directed to the following cases from the appellate court of this circuit: Modern Products Supply Co. v. Drachenberg, 6 Cir., 1945, 152 F.2d 208, certiorari denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030, and Trabon Engineering Corporation v. Dirkes,

6 Cir., 1943, 136 F.2d 24, 27. In the Trabon case Judge Simons speaking for the court used the following pertinent language:

"We are not unmindful of the high standards set in recent years by the Supreme Court as a test of the inventive quality. The Court of Appeals of the Second Circuit (Perkins v. Endicott Johnson Corp., 128 F.2d 208, 218) designates it 'a doctrinal trend' which it is our 'duty, cautiously to be sure, to follow, not to resist.' We heed the admonition to caution as to acquiescence. A patent, granted by the Patent Office, over references identical with those here urged in challenge, which has successfully emerged from interference proceedings, both before the Examiner in Interference and the Board of Appeals in Interference, is not lightly to be stricken down when long recognized tests of invention appear to demonstrate it to be the result of the exercise of creative ingenuity, not expected from mere skill in the art.

* * *

"We are likewise aware of the deep concern felt by patent lawyers and research engineers, not only over higher standards of invention, but over what in some quarters has been thought to be an entirely new concept of invention deriving from Cuno [Engineering] Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58, where it was said that a new device 'however useful it may be, must reveal the flash of creative genius, not merely the skill of the calling.' We do not interpret the observation as indicating anything more significant than that the quality of invention is 'something more' than expected mechanical skill. Nor do we read the phrase as another conscious effort to define the indefinable."

Briefs call the court's attention to the cases of Webster Loom Co. v. Higgins, 1881, supra; Expanded Metal Co. v. Bradford, 1908, 214 U.S. 366, 29 S.Ct.

652, 53 L.Ed. 1034; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; and Goodyear Tire & Rubber Co. Inc., v. Ray-O-Vac Co., 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721. These and many other cases which the court has read or examined use language which sustains the plaintiff's position in the case at bar. Some of them are very old cases; others are of a more recent date. Reference is made to some of the cases cited in this opinion from the Court of Appeals for the Sixth Circuit which have been decided within the past few years. All of these cases, however, antedate the opinion in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162. Regardless of what may have been said heretofore by the Supreme Court or the inferior courts, the rules laid down in this last pronouncement on the subject must be accepted as something of an innovation in patent law. It is a guide to the lower courts in all patent cases but especially so in cases where no new mechanism is shown and where the sole claim to invention rests upon a new and rare combination of known elements into a unit which so advances the art that it must be accepted as invention.

■■ This case is so frequently considered and so well known that it is almost trite to quote from the opinion. I will, however, indulge two quotations.

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test. * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

In a concurring opinion Justice Douglas used the following language:

"The attempts through the years to get a broader, looser conception of patents than the Constitution contemplates have been persistent. The Patent Office, like most administrative agencies, has looked with favor on the opportunity which the exercise of discretion affords to expand its own jurisdiction. And so it has placed a host of gadgets under the armour of patents—gadgets that obviously have had no place in the constitutional scheme of advancing scientific knowledge. A few that have reached this Court show the pressure to extend monopoly to the simplest of devices".

■ In the light of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, supra, I must hold all three patents in suit invalid. Not only are the separate elements old to the art but in view of the Steckel patent No. 1,857,670 the combination and assembly

of elements anticipated the claimed inventions. The mechanisms are rearranged but there is no functional difference when the claims in the patents are compared.

In discussing the presumption of validity the Court of Appeals for this circuit in Electric Vacuum Cleaner Co., Inc., v. P. A. Geier Co., 118 F.2d 221, pointed out that even though there was such a presumption it should not overcome a deliberate judgment of the court that there was no invention. In Cleveland Punch & Shear Works Co. v. E. W. Bliss Co., 6 Cir., 145 F.2d 991, 999, the same court quoted with approval the language from Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 130 F.2d 290, that "the presumption arising from its issuance by the Patent Office is a faint one." These citations from cases of the Court of Appeals of this circuit are, of course, strengthened by Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, supra.

The trend of the decisions of the Supreme Court was obvious long prior to December 4, 1950, the date on which the Supermarket case was decided.

On October 6, 1942, the opinion was handed down in United States Gypsum Co. v. Consolidated Expanded Metal Companies, 130 F.2d 888, 892. In speaking for the court Judge Simons of the Sixth Circuit used the following language:

"Much difficulty has, of course, been experienced by the courts in determining what improvements lie within the expected skill of the art. We adverted to this in Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 92 F.2d 330, 334. Older cases are not very helpful. The patent law is presently in a state of flux. Much water has flowed over the patent dam and we must recognize as have other courts and our own (Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 108 F.2d 109) 'the high standard demanded for invention by the decisions of the Supreme Court in recent years,' (Buono v. Yankee Maid Dress Corp., 2 Cir., 77 F.2d 274, 276). We cannot 'ignore the fact that the Supreme Court, whose word is final, has for a decade or more shown an increasing disposition to raise the standard of originality necessary for a patent,' (Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636), and that it is our 'duty, cautiously to be sure, to follow not to resist.' (Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 218)."

These and many other cases substantiate the conclusions I have reached that the patents in suit are invalid.

The record reveals that at least six domestic steel companies and five foreign companies have been granted licenses to build and operate mills under the patents in suit. Royalties have been paid to the extent of slightly in excess of one and a half million dollars. The law recognizes commercial success but it must be shown that this commercial success is attributable to invention. There are so many independent things which enter into commercial success such as advertising, good business management, economic conditions and salesmanship, that courts are not inclined to place too great an emphasis upon such a fact unless it is shown satisfactorily that real invention is present. The acceptance of the article by the public may tip the scales toward patentability when the question of invention is a close one. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L. Ed. 235; Acton Mfg. Co. v. Louisville Tin & Stove Co., D.C., 116 F.Supp. 796.

I have set out the claims in detail in the particulars in which the plaintiff contends that its patent rights have been infringed. Since the patents have been held to be invalid there could, of course, be no infringement. Nevertheless it is appropriate to discuss this phase of the plaintiff's case.

It would serve no useful purpose to take up each of the claims and compare and differentiate them with the various

items of mechanism in the defendant's mill. There are distinct similarities between many of these claims and the parts used by the defendant in its production of hot rolled strip. After the trial of the case and after the court had studied the drawings in Plaintiff's Exhibit No. P–10 (Keeney and Ferm) and Plaintiff's Exhibit P–13 (Steckel), on invitation of both parties and by pre-arrangement, the judge of this court in company with the attorneys visited the defendant's mill and witnessed the operation of its rolling strip metal. It was obvious that the practice of reversing the hot roll strip repeatedly through the 4-high finishing mill by the use of coilers on either side of the mill was a method portrayed in the patents. There was striking similarity in various phases of the operation.

Alonzo B. Montgomery, patentee of patent No. 2,087,065, was the engineer who built the Newport mill. It may be assumed that mills properly built on the basis of all three of the patents in suit would produce a finished product similar to that produced by the defendant's mill. It is not so much a matter of invention as it is a matter of method and arrangement. The claims collectively in the respective patents in suit are not infringed.

Notwithstanding the argument, both orally and in briefs, by the attorney for the plaintiff, one thing that stands out as a distinguishing feature between the Keeney and Ferm and Steckel patents and the defendant's mill is the use of the pinch rolls on each side of the finishing mill and between the mill and the entry and exit coilers respectively. The use of these pinch rolls is emphasized in the patents. They are not used at all in the defendant's mill. These pinch rolls are identified in the Keeney and Ferm patent, Plaintiff's Exhibit No. P–10, at Figure 65 and in the Steckel patent, Plaintiff's Exhibit No. P–13, as Figures 68 and 64.

It is argued by the plaintiff that these pinch rolls are not necessary to the operation of the patents and that other methods known to the art could have been used mechanically to serve the same purpose. The defendant contends that the addition of the pinch rolls to its mill would be to make a radical change in its entire mechanism insofar as the function of the two coilers is concerned. As one witness for the defendant put it: the mechanism for feeding the strip into the coilers made the defendant's mill and the mills described in the Steckel and Keeney and Ferm patents as different as "day and night". In the defendant's mill the reel itself feeds the strip back to the 4-high mill through power delivered by the reel. The strip is thus pushed without tension back through the side guides into the mill. Upon contact with the mill the strip receives a pulling from one coiler and a pushing toward the other coiler. This does give tension but there is no intervening tension between the coiler and the mill as there is in both the Keeney and Ferm and Steckel patents. In those patents, it seems to me, the pinch rolls have a useful and positive function in preventing the strip from buckling while at the same time guiding the strip into the coiler. In the operation it is seen that the strip never loses contact with both the 4-high mill and one or the other of the pinch rolls. Unless something was substituted for the pinch rolls the coilers would have to have additional mechanical functions in order to compensate for the pulling back of the pinch roll in guiding the strip from the coiler into the mill as it traveled in one direction and from the mill into the coiler as it traveled in the reverse direction.

It is true that during the winding operation the pinch roll motor is stopped and the driving shaft is disconnected by the opening of its magnetic clutch, but as pointed out in the application, Plaintiff's Exhibit No. P–2, when "the reducing rolls are then adjusted and started in the opposite direction, * * * the pinch rolls are then driven in the opposite direction to feed the strip back through the reducing rolls, whence it goes to the coiler * * *."

The matter of feeding the strip to the coiler is of signal importance. Mr. Montgomery testified that the vital and critical features of the mill are the coiling furnace and the means of getting the strip to the coilers and back to the mill. That he said, is the important part of the mill. This witness further testified that in the Keeney and Ferm patent there is no possible way to get the strip from the coiler to the 4-high mill without the use of the pinch rolls.

In the Steckel patent in suit, No. 1,-977,214, Claim 17 points out the function of the pinch rolls and describes them as being a part of the roll table unit. I quote the following language of the claim:

"17. In combination with a rolling mill adapted for the rolling of material first in one direction and then in the other, a roll table for feeding material to the mill, a pinch roll cooperating with a roll of the roll table, means for driving one of the cooperating pinch rolls, a second pinch roll cooperating with a roll of the table on the opposite side of the mill from the first-mentioned pinch roll, and means whereby said second-mentioned pinch roll exerts a restraining tension on said material."

The witness, Montgomery, testified that it was the pinch rolls that fed the strip as it issued from the 4-high mill to the coiler; that the pinch roll and the coiling thickness were "down together" to receive the strip as it issued from the mill and that it was driven at practically the same speed as the mill to cause tension between the mill and the pinch rolls and deliver the strip to the coiling reel.

In the Steckel patent the pinch rolls operate to maintain the material under tension and thus insure straightness of the product. The pinch rolls on the exit side are arranged to exert a forward pull on the material and those on the entering side are arranged to impart a drag, thus causing the material to issue straight.

Mr. Montgomery stated that according to the construction of the coiling reel in the Steckel patent there is no way to feed the strip back to the mill from the coiler without the use of the pinch rolls; that without the pinch rolls the strip would uncoil in the furnace and produce a "cobble" or mass that could not be handled.

The entry and exit coilers in the defendant's mill are identical in mechanism and function. They are provided with burners and the heat of the coiler furnace tends to maintain the heat in the strip as it passes through these respective coilers. The importance of the coiling reel (Plaintiff's Exhibit No. P-9) in the defendant's mill cannot be overlooked. It is through the mechanism of this reel that the end of the strip is expelled from the coiler back to the roll tables. This process of expelling the strip is in the coiler mechanism and entirely independent of any other mechanical device. When the strip enters the coiler and is fully coiled, the trailing end, in the defendant's mill, is entirely free from any equipment which would aid in pulling it out of the coiler and starting it on its return trip through the 4-high stand.

This is not true in either the Steckel or Keeney and Ferm mechanisms since in each of these patents the trailing end of the strip, after the coil in the coiling furnace is fully completed, is still in contact with the pinch rolls. The pinch rolls mechanically aid in keeping the strip taut and directing it on its return journey to the roll table and through the finishing mill. In the defendant's mill the strip is prevented from uncoiling in the furnace and the power from the reel itself pushes the strip to the mill. Mr. Montgomery testified that in the Keeney and Ferm patent the end thrust which the coiling reel gives to the strip in its uncoiling operation is "a very, very small amount" and not enough to force the strip out of the transverse opening.

The friction is great in a heavy piece of steel. The coiling reel in both the

Keeney and Ferm and Steckel patents is not so constructed as to produce sufficient mechanical power to compensate for this element of friction without the aid of pinch rolls. It is suggested in questions to Mr. Montgomery that the consequent endwise thrust on the strip that would result from either of the patents in suit could be compensated for by putting in additional little rollers at the opening of the coiler and that these would compensate also for the friction. Such an expedient does not appear practical in the light of the testimony of all the engineers in the case. In the defendant's mill the endwise thrust on the strip to expel it from the coiler is created by the rotation of the reel itself. This functional attribute seems to be lacking in the mills described in the patents in suit.

The witness, Lloyd L. Wilson, offered by the plaintiff, testified at length with reference to the pinch rolls. It was Mr. Wilson's opinion that the pinch rolls were not a necessary part of the operation of either the Keeney and Ferm or Steckel patents. He explained that the coiled hot rolled strip could be expelled from the coilers by resorting to one of two methods. One of these was that the end of the strip would be attached to the reel in reversing the finishing process through the 4-high mill; that when the strip reached the maximum coil with the trailing end still in the opposite coiler that the reel could be reversed and used to pull the strip back into the coiler. As an alternative he suggested that the strip could be coiled to a point which would leave the trailing end on the opposite side of the finishing stand from the coiler in which the strip was being coiled. In other words, in either of these methods, neither end of the strip would ever pass through the reducing rolls of the finishing stand more than once. Mr. Wilson candidly admitted that there would be several feet to be cut off the end of the strip and that this material would be wasted because it had never been reduced.

One of the principal features emphasized by the Steckel and Keeney and Ferm patents is that the strip is rolled from the ingot into the finished product in the original heat and without any raising of temperature. In the defendant's mill it will be observed that there is heating equipment between the roughing mill and the finishing mill known as the roller hearth furnace. The metal is reheated in this roller hearth furnace and heat is added to the original heat with which the ingot came from the soaking pit. The strip is not fed to the finishing mill in the same heat that it leaves the roughing mill. Heat is added by the reheating furnace. This is made necessary as the strip cools when it is stopped for the purpose of shearing off the ends. The contact with the table rollers which are cooler than the strip have a tendency to cool the strip and require the restoration of heat. This heating in the roller hearth furnace restores the heat from around one hundred to one hundred fifty degrees. While the strip does not increase its heat from that with which it originally started, it does acquire heat and thus is not finished in the original heat.

I am of the opinion that the defendant's mill does not infringe any of the patents in suit.

The complaint should be dismissed and the defendant have judgment for its costs. Findings of fact, conclusions of law, and judgment are this day entered.